*10*

**ORIGINAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 7 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ACCUTEL OF TEXAS, INC. ET AL., | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. B-02-054 |
| | § | |
| SOUTHWESTERN BELL TELEPHONE L.P. | § | **JURY** |
| Defendant. | § | |

### PLAINTIFFS ACCUTEL OF TEXAS, INC., ET AL.'S RESPONSE TO
### SOUTHWESTERN BELL'S MOTION TO DISMISS

1.     Southwestern Bell Telephone L.P. ("Southwestern Bell") has moved to have this suit dismissed on the following grounds: first, that this cause of action is controlled by the Federal Telecommunications Act of 1996 ("FTA"), and that plaintiffs, AccuTel of Texas *et al.,* have "failed to exhaust their administrative remedies" under the FTA; and second, that the Public Utility Commission of Texas ("PUC"), not this Court, has primary jurisdiction over the dispute. All of these grounds are without merit. First, plaintiffs bring only state law claims under the Texas Deceptive Trade Practices Act, state anti-trust laws, and a Texas common law theory for recovering money had and received, so that the FTA does not govern this dispute. Even if it did, the arbitration provisions of the FTA apply *only* to the arbitration of negotiations related to contract formation, and do not provide a universal forum for resolving disputes between incumbent local exchange carriers ("ILECs") such as Southwestern Bell competitive local exchange carriers ("CLECs") such as plaintiffs. Second, the doctrine of primary jurisdiction does not require that this suit be dismissed or abated while the Texas Public Utility Commission considers plaintiffs' claims.

1

## ANALYSIS

### I. A.

**Because plaintiffs are pursuing state law causes of action that are not controlled by the Federal Telecommunications Act, the FTA's arbitration provisions do not apply and this cause should not be dismissed.**

2.      Southwestern Bell originally removed this cause on the mistaken grounds that plaintiffs were requesting an adjudication of the proper rate for charges for processing certain electronic orders under the Federal Telecommunications Act of 1996 ("FTA"), and now claims that the FTA's arbitration provisions preclude this Court from exercising jurisdiction over the case.

3.      Southwestern Bell is quite simply wrong on this issue. Even a perfunctory glance at plaintiffs' petition reveals that they are not seeking any adjudication of the "proper rates" under the FTA. Examination of the plaintiffs' complaint shows that plaintiffs' three causes of action are all state law claims: first, to recover for defendant's deceptive trade practices under the Texas Business and Commerce Code; second, to recover monies paid under a Texas common law claim of unjust enrichment; and third, to recover damages arising from defendant's illegal and willful maintenance of monopoly power in violation of TEX. BUS. & COM. CODE ANN. §15.05, Texas' anti-trust statute. The "proper rates" have already been adjudicated by the Public Utility Commission of Texas in 1997 in a number of proceedings consolidated and collectively referred to as the SWBT Mega-Arbitrations: *Petition of MFS Communications Company Inc. for Arbitration of Pricing of Unbundled Loops Agreement Between MFS Communications Company, Inc., and Southwestern Bell Telephone Company,* Docket No. 16189, *et al.*, Award (Dec. 19, 1997)(Phase-II Mega-Arbitration Award). Plaintiffs' complain of Southwestern Bell's failure to charge those rates. Southwestern Bell improperly attempts to re-frame the issues being litigated in this action to suit its own ends, but

2

it cannot choose the claims under which plaintiffs bring suit.

## I. B.
**This case should not be dismissed because, even assuming that it were controlled by the FTA, neither the FTA's arbitration provisions nor the "exhaustion of remedies" doctrine apply.**

4.      Southwestern Bell contends that plaintiffs have "failed to exhaust their administrative remedies" in this case by failing to arbitrate this dispute "as required" by Section 252 of the FTA, and until they do, this Court does not have jurisdiction over the case. In fact, § 252 of the FTA does not provide a forum for resolving the disputes involved in this suit, and the "exhaustion of remedies" doctrine does not apply to this case.

5.      The exhaustion of administrative remedies doctrine determines whether a court has jurisdiction to review an agency action. The exhaustion doctrine states that no one is entitled to judicial review of an agency action until the prescribed administrative remedy has been exhausted. *See* TEX. GOV'T CODE ANN. § 2001.171; *Texas State Board of Examiners in Optometry v. Carp*, 343 S.W.2d 242 (Tex. 1961). Accordingly, the exhaustion doctrine does not apply where the agency lacks jurisdiction over the subject matter of the suit, *Westheimer Independent School District v. Brockette*, 567 S.W.2d 780 (Tex. 1978), nor is the exhaustion of administrative remedies required when the agency cannot give adequate relief, *Texas State Federation of Labor v. Brown & Root, Inc.*, 246 S.W.2d 938 (Tex. Civ. App. 1952, writ ref'd n.r.e.). In this case, § 252 of the FTA does not provide a forum for resolving the disputes involved in plaintiffs' complaint. Noticeably missing from Southwestern Bell's argument is any reproduction of the text of § 252.[1] An examination of the full text of § 252 of the FTA reveals that § 252(b) provides a forum for the arbitration *only* of

---

[1]

Because of its' length, § 252 is not reproduced here, but both § 251 (for background) and § 252 are included as Exhibit A to this response.

3

disputes relating to the *formation* of prospective contracts (interconnection agreements) between the parties. Section 252 of the FTA certainly does not provide a forum for resolving disputes relating to overcharges of rates already approved by the PUC, or claims brought under Texas' Deceptive Trade Practices Act and anti-trust act, and it does not allow the recovery of past overcharges or other damages recoverable under the state laws invoked in plaintiffs' complaint. Since the Texas PUC has no jurisdiction over plaintiffs claims and no authority to give the relief requested, it would be improper to dismiss this cause on the grounds that plaintiffs failed to exhaust their administrative remedies.

6.      Southwestern Bell also cites the fact that plaintiffs' contracts contain an arbitration provision as support for its argument that plaintiffs have failed to exhaust their administrative remedies, and includes as exhibits contract signature pages referencing the arbitration provision. But the plaintiffs are not contractually bound to arbitrate their asserted causes of action, so the cause should not be dismissed on that ground. The arbitration provision, of which a representative copy is reproduced as Exhibit B, provides for the mandatory arbitration *only* of those disputes involving *one percent or less* of the amounts charged by Soutwestern Bell to the relevant plaintiff CLEC under the agreement (and the amounts at issue here are significantly higher than the one percent) and, by its very terms, the arbitration provision specifically does not apply to "all claims arising under federal or state statutes, including, but not limited to, antitrust claims" such as those advanced by plaintiffs. Consequently, this argument is completely without merit.

## II.

### This case should not be dismissed because the Texas PUC does not have primary jurisdiction over plaintiffs' claims.

7.     When both the court and an agency have concurrent original jurisdiction, the doctrine of primary jurisdiction provides for suspending the judicial process whenever the enforcement of a claim involves the initial resolution of issues pending before an administrative body with special competence in those issues. *See United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165 (1956). There are two rationales underlying the doctrine: to promote uniform decision making and to assure expert administration of matters delegated to agencies by the legislature. *See Western Pacific* , 77 S.Ct. at 166. The doctrine is applied case-by-case and at the discretion of the court, based upon the court's analysis of how the underlying reasons for the doctrine fit the particular case before it. *Id.* The doctrine does not customarily require that an agency make *final* determinations. 4 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 22:1 at 82 (2d. 1983). The primary jurisdiction doctrine is not implicated by this case, but even if it were, the disadvantages of suspending or dismissing this cause while the agency deliberates outweigh the negligible advantages of permitting the agency to rule on the issues involved.

> A.     **The doctrine of primary jurisdiction does not apply in this case, so it should not be dismissed or abated.**

8.     Southwestern Bell misstates the facts and misapplies the doctrine when it contends that the PUC has primary jurisdiction over this cause on the grounds that only the PUC has the special competence necessary to set the rates referenced in this case. The truth is that neither of the rationales behind the doctrine – promoting uniform decisionmaking and assuring expert administration of matters delegated to the agency – are implicated in the present case, because this

Court is not being asked to set rates, and the PUC *has already applied its special expertise and resolved these pricing issues* in the PUC's 1997 Phase-II Mega-Arbitration Award[2]. Thus, since this Court is not being asked to set rates, and since the agency has *already made the determination* of the proper rates for the services referenced in this case, there is no need to defer to the agency and the doctrine simply does not apply. Remember, the essence of plaintiffs' complaint is that Southwestern Bell has wrongfully been charging plaintiffs more than the PUC approved rates ever since the PUC's 1997 award.[3]

9.      In any event, there is an exception to the doctrine where the agency is powerless to grant the relief sought and make essential incidental findings. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978 (1976); *Foree v. Crown Central Petroleum Corp.* 431 S.W.2d 312, 315 (Tex. 1968); *Lake County Estates v. Toman*, 624 S.W.2d 677, 681 (Tex. App. – Fort Worth 1981, writ ref'd n.r.e.). Since the PUC's authority to arbitrate derives from § 252 of the FTA, the PUC lacks jurisdiction to rule on plaintiffs' state common law, Deceptive Trade Practices, and anti-trust claims, and cannot award the past overcharges and damages plaintiffs are entitled to under state law. Since the agency cannot rule on these issues, it is senseless to refer the case to the PUC.

---

[2]

*Petition of MFS Communications Company Inc. for Arbitration of Pricing of Unbundled Loops Agreement Between MFS Communications Company, Inc., and Southwestern Bell Telephone Company,* Docket No. 16189, *et al.,* Award (Dec. 19, 1997)

[3]

Southwestern Bell argues that because one of the plaintiffs, AccuTel of Texas, Inc., initiated an arbitration over one of the five charges discussed in this case (electronic new service connect charges), this entire case should be abated or dismissed. Frankly, Accutel of Texas, Inc., initiated arbitration proceedings because, while it felt sure that it was being overcharged by Southwestern Bell, it was unaware that the PUC had already decided this issue in the 1997 Phase-II Mega-Arbitration. Accutel of Texas, Inc., did not participate in the Mega-Arbitration, but the rates set in the Mega-Arb apply to all CLECs.

**B.      Because the advantages of retaining the case outweigh the benefit of deferring the agency, the case should not be dismissed or abated**

10.     Even were the primary jurisdiction doctrine applicable to this case, the negligible advantages gained by deferring to the agency are outweighed by the disadvantages of having the agency make the determination. There are two rationales underlying the doctrine: to promote uniform decision making and to assure expert administration of matters delegated to agencies by the legislature. *See Western Pacific* , 77 S.Ct. at 166; *Kavanaugh v. Underwriters Life Ins. Co.* 231, S.W.2d 753 (Tex. Civ. App. – Waco 1950, writ ref'd.); E. GELLHORN & R. M. LEWIS, ADMINISTRATIVE LAW AND PROCESS IN A NUTSHELL at 390 (3d ed. 1990). The PUC employs highly educated expert analysts whose job it is examine and evaluate reams of data and establish reasonable and fair rates for, among other things, the services involved in this case. If this case involved a request to *set* rates, then it would be most appropriate to defer to the agency's expertise on this issue. However, as discussed above, the Court is not being asked to set rates, as the PUC has already been through this process and ruled on the fair rates for the services at issue in the PUC's 1997 Phase-II Mega-Arbitration Award. Thus, the reasons for deferring to the expertise of the agency are mooted.

11.     While there is no longer any sound reason for allowing the agency to rule on this question, there is great disadvantage in doing so, since the PUC's lack of jurisdiction prevents it from ruling on plaintiffs' state common law, Deceptive Trade Practices, and Anti-Trust claims, and from awarding the past overcharges and damages plaintiffs are entitled to under state law. The parties and the agency would expend vast resources, with all the resulting delay, to reach a determination of little ultimate incremental use to the Court. Under these circumstances, a balancing of the pros and cons of deferring the case shows that it should not be dismissed for lack of primary jurisdiction.

**WHEREFORE,** plaintiff requests the following:

1.      That this action not be dismissed; and

2.      Such other relief to which plaintiffs show themselves to be entitled.

Respectfully submitted,

Mark Foster
Christopher Malish
Foster & Malish, L.L.P.
1403 West Sixth Street
Austin, Texas 78703
(512) 476-8591/(512) 477-8657/fax
By: _Christopher Malish by permission_
     Christopher Malish
     State Bar No. 00791164

AND

Gilberto Hinojosa
Magallanes, Hinojosa & Mancias
1713 Boca Chica Blvd.
Brownsville, Texas 78520
(956) 544-6571
(956) 544-4290

By: _____
     Gilberto Hinojosa
     State Bar No. 09701100
     Federal Id No. 3425
Attorneys in Charge for plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on Geoffrey Amsel, 1010 North St. Mary's Street, Room 1403, San Antonio, Texas 78215, by certified mail return receipt requested/via fax to 210.222.7194, and Eduardo Rodriguez, P.O. Box 2155, Brownsville, Texas 78522 by certified mail return receipt requested/via fax to 956.541.2170 on this ___17th___ day of ___April 2002___

_____
Gilberto Hinojosa

8



PLAINTIFF'S
EXHIBIT

A

--S.652--

S.652

*One Hundred Fourth Congress*

*of the*

*United States of America*

*AT THE SECOND SESSION*

Begun and held at the City of Washington on Wednesday,

the third day of January, one thousand nine hundred and ninety-six

An Act

To promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE; REFERENCES.

(a) SHORT TITLE- This Act may be cited as the `Telecommunications Act of 1996'.

(b) REFERENCES- Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Communications Act of 1934 (47 U.S.C. 151 et seq.).

## SEC. 2. TABLE OF CONTENTS.

The table of contents for this Act is as follows:

Sec. 1. Short title; references.

Sec. 2. Table of contents.

Sec. 3. Definitions.

## TITLE I—TELECOMMUNICATION SERVICES

## Subtitle A—Telecommunications Services

Sec. 101. Establishment of part II of title II.

## `Part II—Development of Competitive Markets

`Sec. 251. Interconnection.

`Sec. 252. Procedures for negotiation, arbitration, and approval of agreements.

`Sec. 253. Removal of barriers to entry.

`Sec. 254. Universal service.

`Sec. 255. Access by persons with disabilities.

`Sec. 256. Coordination for interconnectivity.

`Sec. 257. Market entry barriers proceeding.

`Sec. 258. Illegal changes in subscriber carrier selections.

`Sec. 259. Infrastructure sharing.

`Sec. 260. Provision of telemessaging service.

`Sec. 261. Effect on other requirements.'

Sec. 102. Eligible telecommunications carriers.

Sec. 103. Exempt telecommunications companies.

Sec. 104. Nondiscrimination principle.

## Subtitle B—Special Provisions Concerning Bell Operating Companies

Sec. 151. Bell operating company provisions.

## `PART III—SPECIAL PROVISIONS CONCERNING BELL OPERATING COMPANIES

`Sec. 271. Bell operating company entry into interLATA services.

`Sec. 272. Separate affiliate; safeguards.

`Sec. 273. Manufacturing by Bell operating companies.

`Sec. 274. Electronic publishing by Bell operating companies.

`Sec. 275. Alarm monitoring services.

`Sec. 276. Provision of payphone service.'

## TITLE II—BROADCAST SERVICES

Sec. 201. Broadcast spectrum flexibility.

`Sec. 336. Broadcast spectrum flexibility.'

Sec. 202. Broadcast ownership.

Sec. 203. Term of licenses.

Sec. 204. Broadcast license renewal procedures.

Sec. 205. Direct broadcast satellite service.

Sec. 206. Automated ship distress and safety systems.

`Sec. 365. Automated ship distress and safety systems.'

Sec. 207. Restrictions on over-the-air reception devices.

## TITLE III—CABLE SERVICES

Sec. 301. Cable Act reform.

Sec. 302. Cable service provided by telephone companies.

`Part V—Video Programming Services Provided by Telephone Companies

`Sec. 651. Regulatory treatment of video programming services.

`Sec. 652. Prohibition on buy outs.

`Sec. 653. Establishment of open video systems.'

Sec. 303. Preemption of franchising authority regulation of telecommunications services.

Sec. 304. Competitive availability of navigation devices.

`Sec. 629. Competitive availability of navigation devices.'

Sec. 305. Video programming accessibility.

`Sec. 713. Video programming accessibility.'

## TITLE IV—REGULATORY REFORM

Sec. 401. Regulatory forbearance.

`Sec. 10. Competition in provision of telecommunications service.'

Sec. 402. Biennial review of regulations; regulatory relief.

`Sec. 11. Regulatory reform.'

Sec. 403. Elimination of unnecessary Commission regulations and functions.

# TITLE V—OBSCENITY AND VIOLENCE

## Subtitle A—Obscene, Harassing, and Wrongful Utilization of Telecommunications Facilities

Sec. 501. Short title.

Sec. 502. Obscene or harassing use of telecommunications facilities under the Communications Act of 1934.

Sec. 503. Obscene programming on cable television.

Sec. 504. Scrambling of cable channels for nonsubscribers.

`Sec. 640. Scrambling of cable channels for nonsubscribers.'

Sec. 505. Scrambling of sexually explicit adult video service programming.

`Sec. 641. Scrambling of sexually explicit adult video service programming.'

Sec. 506. Cable operator refusal to carry certain programs.

Sec. 507. Clarification of current laws regarding communication of obscene materials through the use of computers.

Sec. 508. Coercion and enticement of minors.

Sec. 509. Online family empowerment.

`Sec. 230. Protection for private blocking and screening of offensive material.'

## Subtitle B—Violence

Sec. 551. Parental choice in television programming.

Sec. 552. Technology fund.

## Subtitle C—Judicial Review

Sec. 561. Expedited review.

## TITLE VI--EFFECT ON OTHER LAWS

Sec. 601. Applicability of consent decrees and other law.

Sec. 602. Preemption of local taxation with respect to direct-to-home services.

## TITLE VII--MISCELLANEOUS PROVISIONS

Sec. 701. Prevention of unfair billing practices for information or services provided over toll-free telephone calls.

Sec. 702. Privacy of customer information.

`Sec. 222. Privacy of customer information.'

Sec. 703. Pole attachments.

Sec. 704. Facilities siting; radio frequency emission standards.

Sec. 705. Mobile services direct access to long distance carriers.

Sec. 706. Advanced telecommunications incentives.

Sec. 707. Telecommunications Development Fund.

`Sec. 714. Telecommunications Development Fund.'

Sec. 708. National Education Technology Funding Corporation.

Sec. 709. Report on the use of advanced telecommunications services for medical purposes.

Sec. 710. Authorization of appropriations.

## SEC. 3. DEFINITIONS.

(a) ADDITIONAL DEFINITIONS- Section 3 (47 U.S.C. 153) is amended--

(1) in subsection (r)--

(A) by inserting `(A)' after `means'; and

(B) by inserting before the period at the end the following: `, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service'; and

(2) by adding at the end thereof the following:

`(33) AFFILIATE- The term `affiliate' means a person that (directly or indirectly) owns or

controls, is owned or controlled by, or is under common ownership or control with, another person. For purposes of this paragraph, the term `own' means to own an equity interest (or the equivalent thereof) of more than 10 percent.

`(34) AT&T CONSENT DECREE- The term `AT&T Consent Decree' means the order entered August 24, 1982, in the antitrust action styled United States v. Western Electric, Civil Action No. 82-0192, in the United States District Court for the District of Columbia, and includes any judgment or order with respect to such action entered on or after August 24, 1982.

`(35) BELL OPERATING COMPANY- The term `Bell operating company'--

  `(A) means any of the following companies: Bell Telephone Company of Nevada, Illinois Bell Telephone Company, Indiana Bell Telephone Company, Incorporated, Michigan Bell Telephone Company, New England Telephone and Telegraph Company, New Jersey Bell Telephone Company, New York Telephone Company, U S West Communications Company, South Central Bell Telephone Company, Southern Bell Telephone and Telegraph Company, Southwestern Bell Telephone Company, The Bell Telephone Company of Pennsylvania, The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of West Virginia, The Diamond State Telephone Company, The Ohio Bell Telephone Company, The Pacific Telephone and Telegraph Company, or Wisconsin Telephone Company; and

  `(B) includes any successor or assign of any such company that provides wireline telephone exchange service; but

  `(C) does not include an affiliate of any such company, other than an affiliate described in subparagraph (A) or (B).

`(36) CABLE SERVICE- The term `cable service' has the meaning given such term in section 602.

`(37) CABLE SYSTEM- The term `cable system' has the meaning given such term in section 602.

`(38) CUSTOMER PREMISES EQUIPMENT- The term `customer premises equipment' means equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications.

`(39) DIALING PARITY- The term `dialing parity' means that a person that is not an affiliate of a local exchange carrier is able to provide telecommunications services in such a manner that customers have the ability to route automatically, without the use of any access code, their telecommunications to the telecommunications services provider of the customer's designation from among 2 or more telecommunications services providers (including such local exchange carrier).

`(40) EXCHANGE ACCESS- The term `exchange access' means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of

telephone toll services.

`(41) INFORMATION SERVICE- The term `information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

`(42) INTERLATA SERVICE- The term `interLATA service' means telecommunications between a point located in a local access and transport area and a point located outside such area.

`(43) LOCAL ACCESS AND TRANSPORT AREA- The term `local access and transport area' or `LATA' means a contiguous geographic area--

   `(A) established before the date of enactment of the Telecommunications Act of 1996 by a Bell operating company such that no exchange area includes points within more than 1 metropolitan statistical area, consolidated metropolitan statistical area, or State, except as expressly permitted under the AT&T Consent Decree; or

   `(B) established or modified by a Bell operating company after such date of enactment and approved by the Commission.

`(44) LOCAL EXCHANGE CARRIER- The term `local exchange carrier' means any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c), except to the extent that the Commission finds that such service should be included in the definition of such term.

`(45) NETWORK ELEMENT- The term `network element' means a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service.

`(46) NUMBER PORTABILITY- The term `number portability' means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another.

`(47) RURAL TELEPHONE COMPANY- The term `rural telephone company' means a local exchange carrier operating entity to the extent that such entity--

   `(A) provides common carrier service to any local exchange carrier study area that does not include either--

      `(i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the

Census; or

`(ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993;

`(B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines;

`(C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or

`(D) has less than 15 percent of its access lines in communities of more than 50,000 on the date of enactment of the Telecommunications Act of 1996.

`(48) TELECOMMUNICATIONS- The term `telecommunications' means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

`(49) TELECOMMUNICATIONS CARRIER- The term `telecommunications carrier' means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226). A telecommunications carrier shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

`(50) TELECOMMUNICATIONS EQUIPMENT- The term `telecommunications equipment' means equipment, other than customer premises equipment, used by a carrier to provide telecommunications services, and includes software integral to such equipment (including upgrades).

`(51) TELECOMMUNICATIONS SERVICE- The term `telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.'.

(b) COMMON TERMINOLOGY- Except as otherwise provided in this Act, the terms used in this Act have the meanings provided in section 3 of the Communications Act of 1934 (47 U.S.C. 153), as amended by this section.

(c) STYLISTIC CONSISTENCY- Section 3 (47 U.S.C. 153) is amended--

(1) in subsections (e) and (n), by redesignating clauses (1), (2), and (3), as clauses (A), (B), and (C), respectively;

(2) in subsection (w), by redesignating paragraphs (1) through (5) as subparagraphs (A) through`(E), respectively;

(3) in subsections (y) and (z), by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively;

(4) by redesignating subsections (a) through (ff) as paragraphs (1) through (32);

(5) by indenting such paragraphs 2 em spaces;

(6) by inserting after the designation of each such paragraph--

(A) a heading, in a form consistent with the form of the heading of this subsection, consisting of the term defined by such paragraph, or the first term so defined if such paragraph defines more than one term; and

(B) the words `The term';

(7) by changing the first letter of each defined term in such paragraphs from a capital to a lower case letter (except for `United States', `State', `State commission', and `Great Lakes Agreement'); and

(8) by reordering such paragraphs and the additional paragraphs added by subsection (a) in alphabetical order based on the headings of such paragraphs and renumbering such paragraphs as so reordered.

(d) CONFORMING AMENDMENTS- The Act is amended--

(1) in section 225(a)(1), by striking `section 3(h)' and inserting `section 3';

(2) in section 332(d), by striking `section 3(n)' each place it appears and inserting `section 3'; and

(3) in sections 621(d)(3), 636(d), and 637(a)(2), by striking `section 3(v)' and inserting `section 3'.

## TITLE I--TELECOMMUNICATION SERVICES

### Subtitle A--Telecommunications Services

## SEC. 101. ESTABLISHMENT OF PART II OF TITLE II.

(a) AMENDMENT- Title II is amended by inserting after section 229 (47 U.S.C. 229) the following new part:

# `PART II--DEVELOPMENT OF COMPETITIVE MARKETS

## `SEC. 251. INTERCONNECTION.

`(a) GENERAL DUTY OF TELECOMMUNICATIONS CARRIERS- Each telecommunications carrier has the duty--

`(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and

`(2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256.

`(b) OBLIGATIONS OF ALL LOCAL EXCHANGE CARRIERS- Each local exchange carrier has the following duties:

`(1) RESALE- The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

`(2) NUMBER PORTABILITY- The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

`(3) DIALING PARITY- The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

`(4) ACCESS TO RIGHTS-OF-WAY- The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224.

`(5) RECIPROCAL COMPENSATION- The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

`(c) ADDITIONAL OBLIGATIONS OF INCUMBENT LOCAL EXCHANGE CARRIERS- In addition to the duties contained in subsection (b), each incumbent local exchange carrier has the following duties:

`(1) DUTY TO NEGOTIATE- The duty to negotiate in good faith in accordance with section 252 the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

`(2) INTERCONNECTION- The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network--

`(A) for the transmission and routing of telephone exchange service and exchange access;

`(B) at any technically feasible point within the carrier's network;

`(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

`(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252.

`(3) UNBUNDLED ACCESS- The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

`(4) RESALE- The duty--

> `(A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

> `(B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

`(5) NOTICE OF CHANGES- The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

`(6) COLLOCATION- The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

`(d) IMPLEMENTATION-

`(1) IN GENERAL- Within 6 months after the date of enactment of the Telecommunications Act of 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

`(2) ACCESS STANDARDS- In determining what network elements should be made available for purposes of subsection (c)(3), the Commission shall consider, at a minimum, whether--

> `(A) access to such network elements as are proprietary in nature is necessary; and

> `(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

`(3) PRESERVATION OF STATE ACCESS REGULATIONS- In prescribing and

enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that--

`(A) establishes access and interconnection obligations of local exchange carriers;

`(B) is consistent with the requirements of this section; and

`(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

`(e) NUMBERING ADMINISTRATION-

`(1) COMMISSION AUTHORITY AND JURISDICTION- The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

`(2) COSTS- The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

`(f) EXEMPTIONS, SUSPENSIONS, AND MODIFICATIONS-

`(1) EXEMPTION FOR CERTAIN RURAL TELEPHONE COMPANIES-

`(A) EXEMPTION- Subsection (c) of this section shall not apply to a rural telephone company until (i) such company has received a bona fide request for interconnection, services, or network elements, and (ii) the State commission determines (under subparagraph (B)) that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 (other than subsections (b)(7) and (c)(1)(D) thereof).

`(B) STATE TERMINATION OF EXEMPTION AND IMPLEMENTATION SCHEDULE- The party making a bona fide request of a rural telephone company for interconnection, services, or network elements shall submit a notice of its request to the State commission. The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A). Within 120 days after the State commission receives notice of the request, the State commission shall terminate the exemption if the request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 (other than subsections (b)(7) and (c)(1)(D) thereof). Upon termination of the exemption, a State commission shall establish an implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations.

`(C) LIMITATION ON EXEMPTION- The exemption provided by this paragraph shall not apply with respect to a request under subsection (c) from a cable operator providing video programming, and seeking to provide any telecommunications service, in the area in which the rural telephone company provides video

programming. The limitation contained in this subparagraph shall not apply to a rural telephone company that is providing video programming on the date of enactment of the Telecommunications Act of 1996.

`(2) SUSPENSIONS AND MODIFICATIONS FOR RURAL CARRIERS- A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification--

   `(A) is necessary--

      `(i) to avoid a significant adverse economic impact on users of telecommunications services generally;

      `(ii) to avoid imposing a requirement that is unduly economically burdensome; or

      `(iii) to avoid imposing a requirement that is technically infeasible; and

   `(B) is consistent with the public interest, convenience, and necessity.

The State commission shall act upon any petition filed under this paragraph within 180 days after receiving such petition. Pending such action, the State commission may suspend enforcement of the requirement or requirements to which the petition applies with respect to the petitioning carrier or carriers.

`(g) CONTINUED ENFORCEMENT OF EXCHANGE ACCESS AND INTERCONNECTION REQUIREMENTS- On and after the date of enactment of the Telecommunications Act of 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding the date of enactment of the Telecommunications Act of 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after such date of enactment. During the period beginning on such date of enactment and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

`(h) DEFINITION OF INCUMBENT LOCAL EXCHANGE CARRIER-

   `(1) DEFINITION- For purposes of this section, the term `incumbent local exchange carrier' means, with respect to an area, the local exchange carrier that--

      `(A) on the date of enactment of the Telecommunications Act of 1996, provided telephone exchange service in such area; and

`(B)(i) on such date of enactment, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or

`(ii) is a person or entity that, on or after such date of enactment, became a successor or assign of a member described in clause (i).

`(2) TREATMENT OF COMPARABLE CARRIERS AS INCUMBENTS- The Commission may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if--

`(A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in paragraph (1);

`(B) such carrier has substantially replaced an incumbent local exchange carrier described in paragraph (1); and

`(C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section.

`(i) SAVINGS PROVISION- Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201.

## `SEC. 252. PROCEDURES FOR NEGOTIATION, ARBITRATION, AND APPROVAL OF AGREEMENTS.

`(a) AGREEMENTS ARRIVED AT THROUGH NEGOTIATION-

`(1) VOLUNTARY NEGOTIATIONS- Upon receiving a request for interconnection, services, or network elements pursuant to section 251, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before the date of enactment of the Telecommunications Act of 1996, shall be submitted to the State commission under subsection (e) of this section.

`(2) MEDIATION- Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

`(b) AGREEMENTS ARRIVED AT THROUGH COMPULSORY ARBITRATION-

`(1) ARBITRATION- During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

`(2) DUTY OF PETITIONER-

    `(A) A party that petitions a State commission under paragraph (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning--

        `(i) the unresolved issues;

        `(ii) the position of each of the parties with respect to those issues; and

        `(iii) any other issue discussed and resolved by the parties.

    `(B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

`(3) OPPORTUNITY TO RESPOND- A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

`(4) ACTION BY STATE COMMISSION-

    `(A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).

    `(B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.

    `(C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

`(5) REFUSAL TO NEGOTIATE- The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

`(c) STANDARDS FOR ARBITRATION- In resolving by arbitration under subsection (b) any open issues and imposing conditions upon the parties to the agreement, a State commission shall--

    `(1) ensure that such resolution and conditions meet the requirements of section 251, including the regulations prescribed by the Commission pursuant to section 251;

`(2) establish any rates for interconnection, services, or network elements according to subsection (d); and

`(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

`(d) PRICING STANDARDS-

`(1) INTERCONNECTION AND NETWORK ELEMENT CHARGES- Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section--

`(A) shall be--

`(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

`(ii) nondiscriminatory, and

`(B) may include a reasonable profit.

`(2) CHARGES FOR TRANSPORT AND TERMINATION OF TRAFFIC-

`(A) IN GENERAL- For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5), a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless--

`(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

`(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

`(B) RULES OF CONSTRUCTION- This paragraph shall not be construed--

`(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or

`(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

`(3) WHOLESALE PRICES FOR TELECOMMUNICATIONS SERVICES- For the purposes of section 251(c)(4), a State commission shall determine wholesale rates on the

basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

`(e) APPROVAL BY STATE COMMISSION-

`(1) APPROVAL REQUIRED- Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

`(2) GROUNDS FOR REJECTION- The State commission may only reject--

`(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) if it finds that--

`(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or

`(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or

`(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) if it finds that the agreement does not meet the requirements of section 251, including the regulations prescribed by the Commission pursuant to section 251, or the standards set forth in subsection (d) of this section.

`(3) PRESERVATION OF AUTHORITY- Notwithstanding paragraph (2), but subject to section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

`(4) SCHEDULE FOR DECISION- If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a), or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b), the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

`(5) COMMISSION TO ACT IF STATE WILL NOT ACT- If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

`(6) REVIEW OF STATE COMMISSION ACTIONS- In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination

under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

`(f) STATEMENTS OF GENERALLY AVAILABLE TERMS-

    `(1) IN GENERAL- A Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 and the regulations thereunder and the standards applicable under this section.

    `(2) STATE COMMISSION REVIEW- A State commission may not approve such statement unless such statement complies with subsection (d) of this section and section 251 and the regulations thereunder. Except as provided in section 253, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of such statement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

    `(3) SCHEDULE FOR REVIEW- The State commission to which a statement is submitted shall, not later than 60 days after the date of such submission--

        `(A) complete the review of such statement under paragraph (2) (including any reconsideration thereof), unless the submitting carrier agrees to an extension of the period for such review; or

        `(B) permit such statement to take effect.

    `(4) AUTHORITY TO CONTINUE REVIEW- Paragraph (3) shall not preclude the State commission from continuing to review a statement that has been permitted to take effect under subparagraph (B) of such paragraph or from approving or disapproving such statement under paragraph (2).

    `(5) DUTY TO NEGOTIATE NOT AFFECTED- The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251.

`(g) CONSOLIDATION OF STATE PROCEEDINGS- Where not inconsistent with the requirements of this Act, a State commission may, to the extent practical, consolidate proceedings under sections 214(e), 251(f), 253, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this Act.

`(h) FILING REQUIRED- A State commission shall make a copy of each agreement approved under subsection (e) and each statement approved under subsection (f) available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

`(i) AVAILABILITY TO OTHER TELECOMMUNICATIONS CARRIERS- A local exchange

carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

`(j) DEFINITION OF INCUMBENT LOCAL EXCHANGE CARRIER- For purposes of this section, the term `incumbent local exchange carrier' has the meaning provided in section 251(h).

## `SEC. 253. REMOVAL OF BARRIERS TO ENTRY.

`(a) IN GENERAL- No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

`(b) STATE REGULATORY AUTHORITY- Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

`(c) STATE AND LOCAL GOVERNMENT AUTHORITY- Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

`(d) PREEMPTION- If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

`(e) COMMERCIAL MOBILE SERVICE PROVIDERS- Nothing in this section shall affect the application of section 332(c)(3) to commercial mobile service providers.

`(f) RURAL MARKETS- It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply--

`(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) that effectively prevents a competitor from meeting the requirements of section 214(e)(1); and

`(2) to a provider of commercial mobile services.

## `SEC. 254. UNIVERSAL SERVICE.

`(a) PROCEDURES TO REVIEW UNIVERSAL SERVICE REQUIREMENTS-



**PLAINTIFF'S EXHIBIT**
*B*

XVIII.     DISPUTE RESOLUTION

    A.     Finality of Disputes

        1.     Except as otherwise specifically provided for in this Agreement, no claims will be brought for disputes arising from this Agreement more than 24 months from the date the occurrence which gives rise to the dispute is discovered or reasonably should have been discovered with the exercise of due care and attention.

    B.     Alternative to Litigation

        1.     The Parties desire to resolve disputes arising out of this Agreement without litigation.   Accordingly, the Parties agree to use the following Dispute Resolution procedure with respect to any controversy or claim arising out of or relating to this Agreement or its breach.

    C.     Commencing Dispute Resolution

        1.     Dispute Resolution shall commence upon the sending from one Party to the other of written notice of a controversy or claim arising out of or relating to this Agreement or its breach.   No Party may pursue any claim unless such written notice has first been given to the other Party.

    D.     Informal Resolution of Disputes

        1.     When such written notice has been given, as required by Section C, Commencing Dispute Resolution, each Party will appoint a knowledgeable, responsible representative to meet and negotiate in good faith to resolve any dispute arising under this Agreement. The location, form, frequency, duration, and conclusion of these discussions will be left to the discretion of the representatives. Upon agreement, the representatives may utilize other alternative dispute resolution procedures such as mediation to assist in the negotiations.   Discussions and the correspondence among the representatives for purposes of settlement are exempt from discovery and production and will not be admissible in the arbitration described below or in any lawsuit without the concurrence of both parties.  Documents identified in or provided

with such communications, which are not prepared for purposes of the negotiations, are not so exempted and, if otherwise admissible, may be admitted in evidence in the arbitration or lawsuit.

E.    Formal Dispute Resolution

1.    If the Parties are unable to resolve the dispute through the informal procedure described above in Section D, Informal Resolution of Disputes, then either Party may invoke the following formal Dispute Resolution procedures.  Unless agreed upon by the Parties, formal dispute resolution procedures described below, including arbitration or other procedures as appropriate, may be invoked not earlier than sixty (60) days after the date of the letter initiating dispute resolution under Section C, Commencing Dispute Resolution.

2.    Claims Subject to Mandatory Arbitration.  The following claims, if not settled through informal dispute resolution, will be subject to mandatory arbitration pursuant to Section F, Arbitration below:

a.    All unresolved billing disputes involving one (1) percent or less of the amounts charged to CLEC by SWBT under this Agreement during the Contract Year in which the dispute arises.  During the first Contract Year the Parties will annualize the initial months up to one year.

b.    All other claims involving one (1) percent or less of the amounts charged to CLEC by SWBT under this Agreement during the Contract Year in which the matter in dispute arises, whether measured by the disputing Party in terms of actual amounts owed or owing, or as amounts representing its business or other risks or obligations relating to the matter in dispute.  During the first Contract Year the Parties will annualize the initial months up to one year.

3.    Claims Subject to Elective Arbitration.  The following claims will be subject to arbitration pursuant to Section F, Arbitration if, and only if, the claim is not settled through informal dispute resolution and both parties agree to arbitration.  If both parties do not agree to arbitration, then either party may proceed with any remedy available to it pursuant to law, equity or agency mechanism.

a. All unresolved billing disputes involving more than one (1) percent of the amounts charged to CLEC by SWBT under this Agreement during the Contract Year in which the matter in dispute arises, whether measured by the disputing Party in terms of actual amounts owed or owning, or as amounts representing its business or other risks or obligation relating to the matter in dispute. During the first Contract Year the Parties will annualize the initial months up to one year.

b. All other claims involving more than one (1) percent of the amounts charged to CLEC by SWBT under this Agreement during the Contract Year in which the matter in dispute arises, whether measured by the disputing Party in terms of actual amounts owed or owing, or as amounts representing its business or other risks or obligations relating to the matter in dispute. During the first Contract Year the Parties will annualize the initial months up to one year.

4. <u>Claims Not Subject to Arbitration</u>  If the following claims are not resolved through informal dispute resolution, they will not be subject to arbitration and must be resolved through any remedy available to a Party pursuant to law, equity or agency mechanism.

a. Actions seeking a temporary restraining order or an injunction related to the purposes of this Agreement.

b. Actions to compel compliance with the Dispute Resolution process.

c. All claims arising under federal or state statute(s), including, but not limited to, antitrust claims.

F. <u>Arbitration</u>

1. Disputes subject to mandatory or elective arbitration under the provisions of this Agreement will be submitted to a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association or pursuant to such other provider of arbitration services or rules as the Parties may agree. Each arbitration will be held in Dallas, Texas, unless the parties agree otherwise. The arbitration hearing will be requested to commence within sixty (60) days of the demand for arbitration.

The arbitrator will control the scheduling so as to process the matter expeditiously. The Parties may submit written briefs upon a schedule determined by the arbitrator. The Parties will request that the arbitrator rule on the dispute by issuing a written opinion within thirty (30) days after the close of hearings. The Federal Arbitration Act, 9 U.S.C. Secs. 1-16, not state law, shall govern the arbitrability of all disputes. The arbitrator will have no authority to award punitive damages, exemplary damages, consequential damages, multiple damages, or any other damages not measured by the prevailing party's actual damages, and may not, in any event, make any ruling, finding or award that does not conform to the terms and conditions of the Agreement. The arbitrator shall be knowledgeable of telecommunications issues. The times specified in this Section may be extended or shortened upon mutual agreement of the Parties or by the arbitrator upon a showing of good cause. Each Party will bear its own costs of these procedures, including attorneys' fees. The Parties will equally split the fees of the arbitration and the arbitrator. The arbitrator's award shall be final and binding and may be entered in any court having jurisdiction thereof. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

G.    Billing Disputes

1.    The following provisions apply specifically to billing disputes.

   a.    The Parties agree that all bills, including bills disputed in whole or in part, are to be paid when due, that interest applies to all overdue invoices as set forth in the applicable provisions of this Agreement, and that no other late payment fee or charge applies to overdue invoices. The Parties further agree that if any billing dispute is resolved in favor of the disputing Party the disputing Party will receive, by crediting or otherwise, interest applied to the disputed amount as set forth in the applicable provisions of this Agreement.

   b.    To the extent that any other portions of this Agreement provide for a bill closure process between the parties, or if such a process is mutually agreed to by the Parties, the procedures involved in such processes will not be deemed to place a particular billing item in dispute for purposes of Section XVIII, Dispute Resolution.

c.  Each Party agrees to notify the other Party of a billing dispute and may invoke the informal dispute resolution process described in Section D, Informal Resolution of Disputes. The parties will endeavor to resolve the dispute within sixty (60) calendar days of the Bill Date on which such disputed charges appear, or, if the charges have been subject to the bill closure process described in Section E, Formal Dispute Resolution, above, within sixty (60) calendar days of the closure of the billing period covered by such bill closure process.

H.  No Conflict

1.  The Dispute Resolution procedures set forth in this Agreement are not intended to conflict with applicable requirements of the Act or the state commission with regard to procedures for the resolution of disputes arising out of this Agreement.

XIX.  VERIFICATION REVIEWS

Each Party to this Agreement will be responsible for the accuracy and quality of its data as submitted to the respective Parties involved. Upon reasonable written notice, each Party or its authorized representative (providing such authorized representative does not have a conflict of interest related to other matters before one of the Parties) shall have the right to conduct a review and verification of the other Party to give assurances of compliance with the provisions of this Agreement. This includes on-site verification reviews at the other Party's or the Party's vendor locations.

After the initial year of this Agreement verification reviews will normally be conducted on an annual basis with provision for staged reviews, as mutually agreed, so that all subject matters are not required to be reviewed at the same time. Follow up reviews will be permitted between annual reviews where significant deviations are found. During the initial year of the Agreement more frequent reviews may occur.

The review will consist of an examination and verification of data involving records, systems, procedures and other information related to the services performed by either Party as related to settlement charges or payments made in connection with this Agreement as determined by either Party to be reasonably required. Each Party, whether or not in connection with an on-site verification

# COURTHOUSE OR AGENCY?
## PRIMARY JURISDICTION AND EXHAUSTION
## OF ADMINISTRATIVE REMEDIES --
## ORIGINS, TRENDS AND DEVELOPMENTS

*Speaker:*
**Mary F. Keller, Austin**
**Texas Department of Insurance**

*Author:*
**Mary Ruth Holder, Austin**
**Texas Department of Insurance**

**1997 ADVANCED ADMINISTRATIVE LAW CONFERENCE**
**STATE BAR OF TEXAS**
**September 1997**

**F**

# COURTHOUSE OR AGENCY?
# PRIMARY JURISDICTION AND EXHAUSTION
# OF ADMINISTRATIVE REMEDIES --
# ORIGINS, TRENDS AND DEVELOPMENTS

*Speaker:*
**Mary F. Keller, Austin**
**Texas Department of Insurance**

*Author:*
**Mary Ruth Holder, Austin**
**Texas Department of Insurance**

**1997 ADVANCED ADMINISTRATIVE LAW CONFERENCE**
**STATE BAR OF TEXAS**
**September 1997**

**F**

### *MARY F. KELLER*
Texas Department of Insurance
P. O. Box 149104
Austin, TX  78714-9104
(512) 463-6119

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1993 to Present | *Texas Department of Insurance:* SENIOR ASSOCIATE COMMISSIONER OF INSURANCE |
| 1985 to 1993 | *Texas Attorney General's Office:* DEPUTY ATTORNEY GENERAL |
| 1983 to 1985 | *Texas Attorney General's Office:* SPECIAL ASSISTANT ATTORNEY GENERAL |
| 1979 to 1983 | *Texas Civil Liberties Union:* LEGAL DIRECTOR |
| 1975 to 1979 | *Yale Law School:* LECTURER IN CLINICAL STUDIES AND SUPERVISING ATTORNEY |
| 1974 to 1975 | *New Haven Legal Assistance:* MANAGING ATTORNEY |

## ACADEMIC BACKGROUND
J.D.     University of California at Los Angeles School of Law, 1973
B.A.     University of California at Santa Cruz, 1970

## BAR ADMISSION
Admission to California Bar, December 1973
Admission to Connecticut Bar, April 1974
Admission to Texas Bar, May 1979

## COURTS
Licensed in State Courts of Texas, California and Connecticut; United States District Courts for District of Connecticut, Western, Northern, Southern and Eastern Districts of Texas; United States Court of Appeals in the Second, Fifth and Tenth Circuits; United States Supreme Court.

## PROFESSIONAL AWARDS
* Marvin Award:  National Association of Attorneys General (1992)
* Outstanding Government Lawyer:  Travis County Women Lawyers' Association (1992)

## PUBLICATIONS
"Litigating Under the Texas Equal Rights Amendment", materials prepared for Conference on Women's Legal Rights, State Bar of Texas, 1983

Editor and Co-Author (with Wizner), Connecticut Mental Health Law Practice Manual, (Conn. Bar Foundation, 1978)

"The Penal Model of Juvenile Justice:  Is Juvenile Court Delinquency Jurisdiction Obsolete?", 52 New York University Law Review 1120 (1977) (with Wizner)

Connecticut Bench Book, Section on Family Law

Editor and Co-Author, Connecticut Legal Services Manual (1976)

MARY RUTH HOLDER
Texas Department of Insurance
P.O. Box 149104, Mail Code 110-1A
Austin, Texas  78714-9104
(512) 305-7517


BIOGRAPHICAL INFORMATION


**EDUCATION**

J.D. with Honors 1984, University of Texas School of Law

B.A. 1971, Southern Methodist University


**PROFESSIONAL ACTIVITIES**

Chief, Enforcement Section, Legal and Compliance Division,
    Texas Department of Insurance

Former Director, Legal Services Division,
    Texas Natural Resource Conservation Commission

Former Assistant Attorney General, Environmental Protection Division,
    Office of the Attorney General

Former Briefing Attorney, Office of Chief Justices Pope, Hill,
    Supreme Court of Texas

Board Certified in Administrative Law

Author/Speaker for the State Bar of Texas PDP 1995
    7th Annual Advanced Administrative Law Course

## Table of Contents

I. INTRODUCTION                                                                                    1

II. NATURE AND ORIGIN OF THE PRIMARY JURISDICTION DOCTRINE                 1

III. REASONS FOR APPLYING PRIMARY JURISDICTION                               2

IV. EXCEPTIONS TO AN AGENCY'S PRIMARY JURISDICTION                           3

   A. The "Inherently Judicial" Exception                                        4
    1. QUESTIONS OF LAW                                                      4
    2. COMMON LAW CAUSES OF ACTION: FEDERAL VERSUS STATE COURTS            6
     a) A Federal Court Example: Mississippi Power & Light             7
     b) Texas: Does "Primary" Mean "Exclusive?"                       7
     c) When The Agency's Statute Preserves Common Law Remedies: Nader and Manchester
     Terminal                                                          9
     d) Single Incident or Continuing Conduct?                        11

   B. Agency Cannot Grant Relief Sought or Make Incidental Findings            11

V. PRIMARY JURISDICTION AND A PRE-ENFORCEMENT RULE CHALLENGE               13

VI. CONSEQUENCES OF INVOKING PRIMARY JURISDICTION                          16

   A. Agency decision approached with deference                                16

   B. Agency delay or inaction                                                 17

VII. RECENT DEVELOPMENTS                                                          17

VIII. EVALUATING A PRIMARY JURISDICTION QUESTION; IN A NUTSHELL            18

IX. EXHAUSTION OF ADMINISTRATIVE REMEDIES                                    19

   A. Compared to and Distinguished from Primary Jurisdiction                  19

   B. Where Statutory Scheme Requires Exhaustion: Recent Case Law              20

X. CONCLUSION                                                                      23

Case 1:02-cv-00054   Document 10   Filed in TXSD on 04/17/2002   Page 38 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                    F-1

Courthouse or Agency?
**Primary Jurisdiction and Exhaustion of Administrative Remedies — Origins, Trends and Developments**

Mary Ruth Holder

## I.   INTRODUCTION

Two doctrines are used to determine whether a party may go to court or must first pursue or exhaust remedies before an administrative agency. Both doctrines are used to establish the proper relationship between the courts and administrative agencies, taking into account the special competence of each.

Although the two doctrines are related and are often confused by parties, they are distinguishable. Primary jurisdiction concerns original jurisdiction; exhaustion of remedies concerns appellate jurisdiction. Primary jurisdiction applies when a court and an agency have concurrent jurisdiction over a claim but the court refrains from exercising jurisdiction until an administrative agency makes an initial decision. In many, but certainly not all, cases in which the primary jurisdiction doctrine is applied, agency proceedings have not yet begun. The exhaustion of administrative remedies doctrine is used to determine at what stage a party may obtain judicial review of a matter over which an administrative agency has original jurisdiction. This doctrine comes into play when agency proceedings have already begun and, unless one of the exceptions applies, prevents a court from exercising its jurisdiction until a party has pursued all avenues of relief available to it at the agency.

This paper will discuss primary jurisdiction in detail exploring the origin of the doctrine, reasons underlying it, exceptions to the doctrine, the split between federal and state courts' application of the doctrine and some recent developments. The paper will not discuss exhaustion of administrative remedies in detail. The reader is referred to the thorough and informative papers presented by Dewey M. Helmcamp, III, at the 1996 Advanced Administrative Law Course, Justice Bob Shannon at the 1995 Advanced Administrative Law Course, and Thomas M. Pollan at the 1994 Advanced Administrative Law Course. The paper's discussion of this second doctrine will be limited to some recent developments and issues concerning exhaustion of administrative remedies.

## II.   NATURE AND ORIGIN OF THE PRIMARY JURISDICTION DOCTRINE

Primary jurisdiction is a judicially created doctrine under which a court will either abate the judicial process until after an agency has determined an issue, or dismiss the action if the court determines that the whole dispute should be brought before the agency. The doctrine is applied case-by-case and at the discretion of the court based upon the court's analysis of how the underlying reasons for the doctrine fit the particular case before it. *United States v. Western Pacific R. Co.*, 352 U.S. 61, 77 S.Ct.161, 165 (1956). The court in *Western Pacific* stated a pragmatic test for applying the doctrine: "[N]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *See also, Southwestern Bell v. P.U.C.*, 735 S.W.2d 663, 672 n.3 (Tex. App.-Austin 1987, no writ). Because the doctrine has been declared to be prudential rather than jurisdictional, an abuse of discretion standard of review has been applied. *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir. 1988); *Shell Pipeline Corp. v. Coastal States Trading, Inc.*, 788 S.W.2d 837, 842 (Tex. App.-Houston [1st Dist.] 1990, writ denied); *Simmons v. Danco, Inc.*, 563 S.W.2d 376, 378 (Tex. Civ. App.-Dallas 1978, writ ref'd n.r.e.). *But cf., Kavanaugh v. Underwriters Life Ins. Co.*, 231 S.W. 2d 753, 755 (Tex. Civ. App.-Waco 1950, writ ref'd); *American Pawn and Jewelry, Inc. v.*

Case 1:02-cv-00054     Document 10     Filed in TXSD on 04/17/2002     Page 39 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                    F-2

*Kayal*, 923 S.W.2d 670, 672 (Tex. App.-Corpus Christi 1996, writ denied).

It is not necessary for an entire case before a court to fall within the province of an agency before primary jurisdiction comes into play. A court may refrain from proceeding for the resolution of an issue or issues by an agency. In this situation, the court will retain jurisdiction over the dispute, including any issues it does not refer for agency resolution, but will postpone its decisionmaking until after the agency resolves the issues referred to it. "[I]n such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Western Pacific*, 77 S.Ct.at 165. *See also, Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 494 (1952) (Issues raised in suit by U.S. under the Sherman Act concerning dual-rate system must first be submitted to Federal Maritime Board which had power to determine the reasonableness of such rating systems under the Shipping Act. "This is so even though the facts after they have been appraised by specialized [agency] competence serve as a premise for legal consequences to be judicially defined.")

The doctrine was first developed in *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct.350 (1907). Abilene sued the railroad for damages in state court alleging that the railroad's rates for shipping several loads of cotton seed, rates approved by the Interstate Commerce Commission, were unreasonably high and discriminatory. The Court recognized that prior to passage of the Interstate Commerce Act in 1887, Abilene had a common law right to an action for damages for the breach of duty to charge reasonable rates. One commentator explained that a major factor in passage of the Act was Congressional recognition that the common law remedy was ineffective as a practical matter because of the general powerlessness of shippers (usually individual farmers) compared to the powerful "nation's first 'big business'" (the railroads). B. Schwartz,

ADMINISTRATIVE LAW, §8.27, at 525 (3d ed. 1991). In this context the Court held that after the Interstate Commerce Commission was set up to determine the reasonableness of rates and hear such disputes, the common law remedy was no longer available; the ICC now had primary jurisdiction. This was true even though the Act did not vest the ICC with exclusive jurisdiction and, indeed, included a provision expressly preserving common law causes of action and the right of a person damaged by a carrier to elect administrative or judicial remedies.

Several commentators observe that *Abilene Cotton Oil* could have been treated as a case of federal preemption of state law since a state court decision would have interfered with the ICC's power under the federal statute. They note that in a general sense, the primary jurisdiction doctrine is "conceptually and functionally analogous to the abstention doctrine, except that abstention cases raise analytical difficulties unique to federalism that complicate resolution of abstention issues." R. Pierce, S. Shapiro and P. Verkuil, ADMINISTRATIVE LAW AND PROCESS §5.8.1, at 192-3 (2ed. 1992).

## III.    REASONS FOR APPLYING PRIMARY JURISDICTION

There are two reasons for invoking the doctrine of primary jurisdiction: to promote uniform decisionmaking and to assure expert administration concerning matters delegated to agencies. *Western Pacific*, 77 S.Ct. at 166. The desire for uniform decisions rather than piecemeal rulings on administrative issues provided the basis for deference to the agency's jurisdiction in *Abilene Cotton Oil*, 27 S.Ct. 350, and other early U.S. Supreme Court cases. In *Abilene Cotton Oil* the Court determined that the general purpose of the Interstate Commerce Act was to achieve uniformity of decisions on the reasonableness of rates. The need for uniformity was found to override even the express statutory language preserving common law remedies.

"This must be," said the Court, "because, if the power existed in both courts and the Commission to originally hear complaints on the subject, there might be a divergence between the action of the Commission and a decision of a court." *Id.* at 355. *See also, Great Northern Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 42 S.Ct. 478 (1922).

Texas courts have also relied upon the uniformity of decisionmaking rationale to determine whether to defer to an agency's primary jurisdiction. *Lens Express, Inc. v. Ewald*, 907 S.W.2d 64 (Tex. App.-Austin, 1995, no writ). The plaintiff in that case, Lens Express, a Florida corporation that dispensed contact lenses by mail at discounted prices, formed a managed care subsidiary and entered into preferred provider contracts with Texas optometrists willing to charge discounted fees for their services. Lens Express sought a declaratory judgment that its contracts with the optometrists did not violate the Texas Optometry Act, Tex. Rev. Civ. Stat. Ann. art. 4552, and Texas Optometry Board rules prohibiting manufacturers, wholesalers and retailers of ophthalmic goods from controlling a professional optometrist and requiring the practice of optometry to remain separate from the business of dispensing ophthalmic goods. Lens Express also sought a judgment declaring that parts of the Act created a monopoly and were unconstitutional. The court held that the Act did not create a monopoly or violate substantive due process or equal protection and held that the trial court properly applied the doctrine of primary jurisdiction in dismissing Lens Express' request for declaratory judgment. The court stated that in order to ensure fair enforcement of the Act, uniformity of decisionmaking "is of paramount importance," *Id.* at 71, and that whether the preferred provider contracts violated the Act presented fact based inquiries best determined by the Board. *See also, Shell Pipeline Corp.*, 788 S.W.2d at 842. (Court held Federal Energy Regulatory Commission did not have primary jurisdiction over matters involved in oil trader cause of action against a pipeline operator for negligence and breach of contract in the delivery of crude oil because, among other things, the case did not present a continuing situation that would benefit from uniformity of decisionmaking.)

Later, a second rationale was established. The courts allow an agency to exercise primary jurisdiction so the agency may apply its specialized technical knowledge or experience concerning an issue to be decided. Stated another way, the courts want to assure that an agency will not be bypassed when a case involves a matter especially delegated to it by the legislature. *Foree v. Crown Central Petroleum Corp.*, 431 S.W.2d 312, 316 (Tex. 1968). The second reason for invoking the doctrine was applied in one of the first cases in Texas deciding an issue of primary jurisdiction. *Kavanaugh*, 231 S.W.2d 753. In *Kavanaugh* the court affirmed the trial court's dismissal of a suit by policyholders against the mutual assessment company for mismanagement and the wrongful actions of its officers and directors and to recover amounts illegally paid to the company's president. The court held that primary jurisdiction rested in the Board of Insurance Commissioners which had ample statutory authority to hear plaintiffs' claim and to grant plaintiffs all the relief they sought. Applying the skills and expertise of the Board's actuaries and auditors, the agency could require the removal of the officers and directors, order the election of new officers and directors, demand return of any funds unlawfully expended, put the company into conservation if necessary, or even liquidate it.

Today, both federal and state courts generally analyze a primary jurisdiction issue by evaluating both reasons for the doctrine. *E.g., Id.* at 755; *Western Pacific* 77 S.Ct at 166.

## IV.    EXCEPTIONS TO AN AGENCY'S PRIMARY JURISDICTION

There are at least two exceptions to an agency's primary jurisdiction. The courts will

exercise their original jurisdiction 1) when an issue is inherently judicial in nature; and 2) when the administrative agency is powerless to grant the relief sought and has no authority to make incidental findings that are essential to granting the relief. Occasionally a "third exception" to the doctrine of primary jurisdiction is recognized: where the agency exercises power beyond its authority. *See, e.g. Lake Country Estates, Inc. v. Toman*, 624 S.W.2d 677, 681 (Tex. App.-Ft. Worth 1981, writ ref'd n.r.e.); *Kayal*, 923 S.W.2d at 674. This is actually an exception to the exhaustion of remedies doctrine derived from *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780 (Tex. 1978). This exception is properly considered, however, when primary jurisdiction is raised in a pre-enforcement rule challenge under the Administrative Procedure Act (APA), Tex. Gov't Code §2001.038. *See, e.g., Railroad Comm'n of Texas v. Arco Oil and Gas Co.*, 876 S.W.2d 473, 477-9 (Tex. App.-Austin 1994, writ denied) and section V of this paper.

## A.     The "Inherently Judicial" Exception

Two kinds of cases fall within this first exception: cases presenting questions of law and those involving common law causes of action. For questions of law involving statutory or rule construction, the courts are more willing to allow an agency to make an initial decision but are not constrained by an agency's interpretation if it is unreasonable. The state courts have been especially loathe to postpone or otherwise defer their decisionmaking to an agency in cases involving common law causes of action. Federal courts are generally more willing to invoke primary jurisdiction in these cases.

## 1.     <u>QUESTIONS OF LAW</u>

While few would argue against the notion that questions of law present inherently judicial issues, it can be easier to state that principle in the abstract than to apply it. When, for example, is it appropriate for a court to allow an agency to

make the initial determination concerning interpretation of a statute the agency is charged with administering? Should the court or an agency make an initial decision construing an agency rule?

An early U.S. Supreme Court case held that questions of law should be determined in the first instance by the courts, but confused the principle somewhat by invoking it in a case concerning the construction of a railroad tariff approved by the ICC. *Great Northern R.Co.*, 42 S. Ct. 477. A shipper sued to recover a category of charges claiming that the railroad's tariff contained an exception to the charges applicable to the shipper. The Court held that construction of a railroad tariff presented only a question of law where the words in the tariff were used in their ordinary sense, the facts were undisputed and there was "no occasion for the exercise of administrative discretion," thus, no preliminary determination by the ICC was necessary.

Later cases involving railroad tariff disputes narrowed the usefulness of *Great Northern* in determining whether a case presents a regulatory issue appropriate for initial determination by the courts. For example, *Western Pacific*, 77 S.Ct.161, also concerned a dispute over construction of a railroad tariff. The U.S. refused to pay a freight bill for a shipment of napalm bombs with their fuses removed. Despite the fuse removal, the railroad billed the shipment at its higher rate for incendiary bombs rather than a lower rate for gasoline and sued the U.S. for its failure to pay the higher rate. The Court concluded that the issue of which tariff rate should apply should be initially resolved by the ICC, because the agency had originally applied its expertise to determine the appropriateness of the freight classifications and corresponding rates based on its evaluation of the costs of shipping the various types of freight, and could draw upon that expertise to determine the controversy before the Court of Claims. One commentator has stated that because most tariffs rest ultimately on cost factors, "[t]he result is to make *Great*

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 42 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments
F-5

*Northern* a matter of theory most of the time." Schwartz §8.28, at 530.

In Texas, an exception for issues which present questions of law has been applied in cases involving the exhaustion of administrative remedies doctrine. *See, e.g., Grounds v. Tolar Indep. Sch. Dist.*, 707 S.W.2d 889, 892 (Tex. 1986). Although a party may risk confusing the doctrines of primary jurisdiction and exhaustion of remedies, it may nevertheless be useful to urge consideration of the exhaustion of remedies cases by analogy when relying upon this exception.

A court may defer to agency primary jurisdiction when presented with issues of statutory construction in at least two circumstances. First, a court may look to the agency to determine initially whether an entity or its activities are regulated by the agency under its statute when that determination is in part fact-based and involves expert evaluation of the facts. In other words, the agency may be called upon initially to determine the scope of its statutory jurisdiction. *E.g., J. M. Huber v. Denman*, 367 F. 2d 104, 111-12 (5th Cir. 1966). (In light of the purposes underlying the primary jurisdiction doctrine and the doctrine's flexibility, "there is really nothing startling about submitting to an agency for initial decision the question of its own jurisdiction. That this ultimately is a question of law, probably one of statutory construction, is not fatal.") In *D & S Investments v. Mouer*, 521 S.W.2d 118 (Tex. Civ. App.-Austin 1975, writ ref'd n.r.e.), the court affirmed the trial court's dismissal of a suit for declaratory judgment that an investment company's sales of real property were not securities under the Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-1 *et seq.*, on the basis that the statutory scheme evidenced legislative intent that the Securities Commissioner would make such a determination. Although not an issue in *Mouer*, a reviewing court may later determine the activities were not within the scope of the agency's statutory jurisdiction. *See, e.g., J.M. Huber*, 367 F.2d at 120.

The second situation in which a court may invoke primary jurisdiction in a matter involving statutory construction is to allow an agency to construe an ambiguous statute it administers. Federal courts uphold an agency's interpretation of its own statute in such cases as long as the agency's interpretation is reasonable. *Chevron v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778 (1984). Two commentators state that in light of *Chevron*, courts should refer all such issues to agencies when: "(1) the statutory language is capable of bearing more than one reasonable construction, (2) the choice between or among those alternative constructions is critical to the outcome of the case before the court, and (3) the agency has not previously adopted a construction of the language at issue." Davis & Pierce §14.3, at 285.

Texas courts have long held that when a statute administered by an agency is ambiguous or uncertain the courts will give great weight to the agency's construction unless the interpretation is clearly erroneous or unsound. *E.g., Texas Water Com'n v. Brushy Creek Mun. Utility Dist.*, 917 S.W.2d 19, 21 (Tex. 1996); *Ex parte Roloff*, 510 S.W.2d 913, 915 (Tex. 1974). For a detailed discussion of this principle the reader is referred to Justice Bea Ann Smith, Susan G. Zachos, Judicial Deference to an Agency's Interpretation of Its Statute: The Doctrine's Rationale and Limits, 1997 Advanced Administrative Law Conference, September 1997. Based upon these cases, it would be appropriate for a court to invoke the doctrine of primary jurisdiction for an initial statutory interpretation by the agency responsible for administering such a statute. *But c.f., Amarillo Oil Co. v. Energy-Agri Products, Inc.*, 794 S.W.2d 20 (Tex. 1990), discussed in section IV.A.2.b. Although upon judicial review a court would not have to agree with the agency's interpretation, the court may benefit from an agency's expertise and insight into the issues of statutory construction affecting an industry regulated by it. Davis and Pierce at §14.2.

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 43 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                    F-6

The courts in Texas have held that an agency's interpretation of its own rules is entitled to deference by reviewing courts and such interpretation will be upheld unless it is plainly erroneous or inconsistent with the regulation. *See, e.g., Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Hunter Indus. Facilities, Inc. v. Texas Natural Resource Conservation Comm'n.*, 910 S.W.2d 96 (Tex. App.-Austin 1995, writ denied). Two courts have invoked primary jurisdiction where a dispute required construction of rules or guidelines promulgated by an agency.

In *Southwestern Bell Telephone Co. v. Public Utility Com'n of Texas*, 735 S.W.2d 663, Bell had petitioned the Commission to amend its rule promulgated pursuant to the Public Utility Regulatory Act (PURA), Tex. Rev. Civ. Stat. Ann. art 1446c (Supp. 1987), defining "local exchange service" to include certain switching systems serving small areas within the geographic area encompassed by Bell's certificate of convenience and necessity. When the Commission declined to amend its rule and decided to determine the issues in Bell's tariff revision, Bell sued seeking a declaratory judgment, injunction and mandamus. The court determined that entertaining Bell's claim would require it to construe the PURA's definition of "public utility" and the Commission's rule defining "local exchange service." The court held that the Commission had both exclusive and primary jurisdiction over the matter, based upon the legislative intent manifest in the PURA and the fact-intensive and technical nature of the inquiry before the court. To hold otherwise "would place in disarray the regulatory scheme established by the Legislature in PURA." *Id.* at 668. *See also, Simmons*, 563 S.W.2d 376. (Court held that the trial court abused its discretion by granting a temporary injunction which interfered with the Securities Commissioner's jurisdiction to determine whether a corporation's statement to shareholders constituted a tender offer, within the meaning of the guidelines promulgated by the

agency establishing minimum standards for such offers.)

Finally, several cases have established that agencies are powerless to determine the constitutionality of statutes. *Central Power and Light Co. v. Sharp*, 40 Tex. Sup. Ct. J. 418 (March 21, 1997); *Birdville Indep. Sch. Dist. v. First Baptist Church of Haltom City*, 788 S.W.2d 26 (Tex. App.-Ft. Worth 1988, writ denied); *Texas State Bd. of Pharmacy v. Walgreen Texas Co.*, 520 S.W.2d 845 (Tex. Civ. App.-Austin 1975, writ ref'd n.r.e.). This issue has arisen in the context of questions involving exhaustion of administrative remedies and the courts have held that a party need not exhaust administrative remedies where the constitutionality of a statue is the only issue raised. These cases should be equally applicable to questions involving the doctrine of primary jurisdiction.

Whether the "question of law" exception to the doctrine of primary jurisdiction will defeat initial agency decisionmaking in a particular case may not be as easy to predict as it seems. A party urging this exception should be prepared to show that the issues present a "pure" question of law and do not involve any fact-based matter requiring agency expertise or that agency interpretation of a statute or rule would provide no assistance to the court.

## 2. COMMON LAW CAUSES OF ACTION: FEDERAL VERSUS STATE COURTS

Federal courts and state courts have applied the doctrine of primary jurisdiction in cases involving common law causes of action quite differently. In general, beginning with *Abilene Cotton Oil*, 27 S. Ct. 350, the federal courts have been more willing to defer initial decisionmaking to administrative agencies in these cases. *But c.f., Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978 (1976) (discussed in section IV.A.2.c.) The state courts, on the other hand, have been far less willing to

Case 1:02-cv-00054   Document 10   Filed in TXSD on 04/17/2002   Page 44 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                      F-7

refer issues to an agency for initial decisionmaking in cases involving common law causes of action. These cases, of course, involve issues traditionally decided by the courts and generally an agency is often powerless to grant the relief sought (damages or injunction).

Primary jurisdiction has been raised in actions for trespass and nuisance, *Gregg v. Delhi-Taylor*, 162 Tex. 26, 344 S.W.2d 411 (Tex. 1961); *Manchester Terminal Corp. v. Texas TX Marine Transp. Inc.*, 781 S.W.2d 646 (Tex. App.-Houston [1st Dist.] 1989, writ denied); title to land and property rights, *Amarillo Oil Co.*, 794 S.W.2d 20); fraudulent misrepresentation, *Nader*, 96 S.Ct. 1978 (1976); negligence and breach of contract, *Mississippi Power & Light Company v. United Gas Pipeline Company*, 532 F.2d 412 (5th Cir 1977) *cert. denied*, 429 U.S. 1094, 97 S.Ct.1109 (1977); *Shell Pipeline Corp.*, 788 S.W.2d 837; *Harris County Mun. Utility Dist. No. 48 v. Mitchell*, 915 S.W.2d 859 (Tex. App.-Houston [1st Dist.] 1995, writ denied); *Kayal*, 923 S.W. 670; and slander and tortious interference with contract, *Toman*, 624 S.W.2d 677. While this list is not exhaustive, particularly with regard to federal cases, many of theses cases cited will be discussed further in this section and illustrate the range of common law causes of action in which the doctrine of primary jurisdiction has been considered.

### a)   *A Federal Court Example: Mississippi Power & Light*

*Mississippi Power & Light Company*, 532 F.2d 412, is illustrative of the federal courts' application of the primary jurisdiction doctrine to a common law cause of action. The case was a suit for breach of contract seeking $160 million in damages based upon curtailment of the supply of gas during the natural gas shortage. After several unsuccessful attempts, due to holdings of the Fifth Circuit, to insulate itself via Federal Power Commission (FPC) order from liability for breach of contract for the gas curtailment, United Gas petitioned the FPC to determine whether the availability of damages to some of United's curtailed customers would create an undue preference in violation of the Natural Gas Act, whether its tariff would preclude liability to some of its customers and whether the shortage was caused by United's negligence or willful misconduct. Mississippi Power and Light (MPL) also had petitioned the FPC seeking compensation for United charging a higher rate for gas. These petitions were still pending at the FPC at the time MPL filed suit.

The Court held that abatement of the court proceedings to allow the FPC to exercise its primary jurisdiction was in order. The Court based its decision on several factors. First, the Act provided a statutory basis for pervasive FPC regulation of the curtailment issues. Second, the agency was then currently involved in resolving issues based upon both parties' petitions that would impact the litigation. The Court stated that "[t]he advisability of invoking primary jurisdiction is greatest when the issue is already before the agency." *Id.* at 419. The Court also determined that the FPC's decision would materially aid the court in the litigation and might also immunize United from liability under the common law or, at least, limit its damages.

### b)   *Texas: Does "Primary" Mean "Exclusive?"*

Texas courts have sometimes taken a sharp turn from the traditional federal court analysis of primary jurisdiction questions in cases involving common law causes of action. Applying a test first stated in *Delhi-Taylor Oil Corp.*, 344 S.W.2d at 415, and more fully articulated in *Foree*, 431 S.W.2d 312, Texas courts, when faced with an argument that the agency is not empowered to grant the relief sought (damages or injunction), have inquired whether the agency's statutory scheme evidences legislative intent to vest the agency with "exclusive jurisdiction" over an issue or case. In *Foree* the court stated that the test for applying the primary jurisdiction principle is "not whether

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 45 of 58

Courthouse or Agency?   ·
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                    F-8

some parts of the case are within the exclusive jurisdiction of the courts but whether some parts of the case are within the exclusive jurisdiction of the agency." *Id.* at 316.

This test misses the point of primary jurisdiction. If an agency has exclusive jurisdiction over an issue, a court would not have concurrent jurisdiction; the court would lack original jurisdiction. Two commentators explained the difference between the question of whether an issue is within the agency's primary jurisdiction and whether the agency has exclusive statutory jurisdiction to resolve an issue:

> Determination of a question concerning the scope of an agency's statutory jurisdiction requires detailed analysis of statutory provisions and, in many cases, of the factual context in which the issue arises. By contrast, determination of the agency's primary jurisdiction involves a more pragmatic evaluation of the advantages and disadvantages of allowing the agency to resolve an issue in the first instance.

K. Davis & R. Pierce, ADMINISTRATIVE LAW TREATISE §14.1, at 272 (3d ed. 1994). (It is interesting to note that the court in *Foree* took its test from a 1950 Davis hornbook. *Foree* at 316.)

The Fifth Circuit has observed that mixing the concepts of primary jurisdiction and exclusive jurisdiction in this way creates a further blurring of the distinction between primary jurisdiction and exhaustion of administrative remedies. *Penny v. South-western Bell Telephone Co.,* 906 F.2d 182, 187 n.3 (1990). Nevertheless, the *Foree* test is often cited, although not always applied in Texas cases. It is more likely to be applied in cases where the "inherently judicial" exception to the doctrine of primary jurisdiction is used to defeat referral of issues for an initial agency determination. Despite

*Foree's* exclusive jurisdiction test, both earlier and subsequent Texas courts have applied the primary jurisdiction doctrine as originally developed. *See, e.g., Kavanaugh,* 231 S.W.2d 753; *Toman,* 624 S.W.2d 677; *Lens Express, Inc.,* 907 S.W.2d 62.

*Delhi-Taylor Oil Corp.* 344 S.W.2d 411, was an early case in which the Texas Supreme Court ruled on whether to apply the doctrine of primary jurisdiction to a common law cause of action. Gregg owned an oil and gas lease in property adjoining lands in which Delhi-Taylor owned the mineral interest. Delhi-Taylor sought to enjoin Gregg from carrying out plans to increase his well's productivity by fracturing the common gas producing formation extending into Delhi-Taylor's lease. Gregg argued that the court should abstain from hearing the controversy and defer to the Railroad Commission's jurisdiction over the oil and gas industry, including its authority to make and enforce rules to prevent waste and protect correlative rights and to supervise the drilling and completion of wells.

The Court characterized Delhi-Taylor's claim as a suit to determine whether subsurface trespass would occur, a claim inherently judicial in nature that presented questions determined by the courts previously and stated "the courts are not ousted from jurisdiction unless the Legislature by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body." *Id.* at 415. The court decided that the statutes cited by Gregg did not vest exclusive jurisdiction with the Commission, nor had the Commission promulgated any rule specifically addressing the process of sand fracturing so as to prevent waste or requiring drilling or operation in a manner that would prevent injury to adjoining property. In a lengthy footnote, *Id.* at 413 n.5, the court reviewed the development of the primary jurisdiction doctrine and, significantly, set forth statements by commentators criticizing the doctrine. The court held that the Commission did not have primary jurisdiction to prevent the subsurface trespass

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 46 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                          F-9

because it did not have exclusive jurisdiction to do so.

The opinion in *Amarillo Oil Co.*, 794 S.W.2d 20, presents another negative reaction to primary jurisdiction but based upon a very slim analysis. Amarillo Oil owned the rights to natural gas produced from wells classified as oil wells by the Railroad Commission and sued Energy-Agri, the owner of the right to produce oil and casinghead gas from the same acreage, to quiet title to the gas and to enjoin Energy-Agri from producing gas from the brown dolomite formation on the acreage. The dispute was whether the gas being extracted by Energy-Agri was "gas" thus belonging to Amarillo or "casinghead gas" belonging to Energy-Agri. The issue was tried to a jury which found adversely to Amarillo Oil and the trial court rendered a take nothing judgment. The Court of Appeals dismissed the case holding that the suit was an impermissible collateral attack on the Railroad's exclusive original jurisdiction. The Supreme Court, two Justices dissenting, reversed, rendered judgment for Amarillo and remanded for a determination of Amarillo's damages.

With regard to the primary jurisdiction issue, the court cited the *Foree* exclusive jurisdiction test but, unlike the court of appeals, did not apply it to the case. The court simply held that the Railroad Commission had no authority to determine title to land or property rights (i.e. could not grant the relief sought) and that Amarillo's action was inherently judicial in nature. The court acknowledged the Railroad Commission's jurisdiction over issues in the case but stated "the courts have jurisdiction over this suit notwithstanding the primary jurisdiction doctrine." *Id.* at 26. This begs the question. *Amarillo Oil* added nothing to the state's jurisprudence concerning primary jurisdiction.

The court further determined that Energy-Agri was producing "gas" rather than "casinghead gas," within the meaning of the Texas Natural Resources Code Ann. §86.002(10)(Vernon

1988). Interestingly, in order to reach its conclusion, the court reviewed many expert sources, including various treatises and a manual of oil and gas terms, *Id.* at 23-4, rather than referring the issue to the expertise of the Railroad Commission charged with well classification.

Although the *Foree* exclusive jurisdiction test is most often applied to reject applicability of the primary jurisdiction doctrine, recently the Corpus Christi Court of Appeals applied the test to a common law cause of action for breach of contract and conversion against a pawnshop that lost the plaintiff's jewelry. The court held that the Consumer Credit Commissioner had exclusive jurisdiction over the "replacement issues" in the case (whether the jewelry offered by the pawnshop as a replacement was of "like kind.") *Kayal*, 923 S.W.2d 670. The court held that Kayal's claims for breach of contract and conversion, however, were inherently judicial in nature and would be within the courts' purview, but nevertheless dismissed the case for lack of jurisdiction.

### c) **When The Agency's Statute Preserves Common Law Remedies: Nader and Manchester Terminal**

In one state and one federal case, the courts refused to apply the doctrine of primary jurisdiction to common law causes of action where the agency's statutes expressly preserved common law remedies. In *Nader*, 96 S.Ct. 1978, consumer advocate Ralph Nader was "bumped" from an overbooked flight and brought both a common law action alleging that the airline's undisclosed deliberate overbooking constituted fraudulent misrepresentation and a statutory action under the Federal Aviation Act of 1958, §404(b) (prohibiting discrimination, undue prejudice or disadvantage in air transportation) based on the airline's failure to afford him boarding priority under its rules filed with the Civil Aeronautics Board (CAB). He was awarded compensatory and punitive damages ($10 and $25,000 respectively) by the trial court

but the D.C. Circuit reversed, remanded the statutory claim for further findings, and ordered the district court to stay the action on the basis that the CAB had primary jurisdiction to determine whether the airline had engaged in fraudulent or deceptive practices within the meaning of §411 of the Aviation Act and to issue a cease and desist order pursuant to the Act. The Court of Appeals stated that the Act contained a provision preserving common law remedies, but applied *Abilene Cotton Oil*, 27 S.Ct 350, to hold that the provision should not be read literally to block the CAB's primary jurisdiction.

The Supreme Court reversed, holding that the CAB's power to enforce §411 of the Act did not include the statutory power to immunize otherwise fraudulent conduct. The CAB could not vindicate private rights under §411 of the Act and individual consumers had no right to initiate CAB proceedings under that provision; thus, the Court reasoned, Congress did not intend to require private litigants to obtain a CAB decision before pursuing common law remedies and the common law remedies savings clause should be given effect. The Court distinguished *Abilene Cotton Oil*, as a case presenting "an irreconcilable conflict between the statutory scheme and the persistence of common-law remedies" in which the carrier would have been "put in an untenable position when the agency and a court disagreed on the reasonableness of a rate." *Nader* at 1984-5. The Court recognized that in some cases, despite a common law remedy savings clause and the fact that an agency may lack the power to confer immunity from common law liability, the need to apply agency expertise may still call for referral of issues to an agency. *Id.* at 1986-7. Here, however, the Court said it was not being called upon to adjudicate a challenge to a tariff provision or determine the reasonableness of a rate. Rather, the question before it was "within the conventional competence of the courts" and the "judgment of a technically expert body" was unlikely to assist the court. *Id.* at 1985, 87.

This decision has been criticized as being merely result oriented:

> Ordinarily, the Court invokes primary jurisdiction in these circumstances even if it ultimately rejects the agency's solution. The Court's decision in *Nader* might be explained better as a visceral response of the Justices to the widespread frustration experienced by travelers with reservations who were "bumped" than as a careful application of the primary jurisdiction doctrine.

R. Pierce, S. Shapiro and P. Verkuil §5.8.4, at 198. Another commentator, however, views the decision as signaling the Court's long overdue recognition of the unfairness in requiring a plaintiff to await an agency process which the plaintiff has no right to invoke and which cannot provide the plaintiff the relief he or she seeks. Schwartz §8.32, at 541.

The plaintiff in *Manchester Terminal Corp.*, 781 S.W.2d 646, the owner and operator of a marine storage facility, brought a common law nuisance and trespass action to abate and recover damages for air pollution from the owner of a neighboring petroleum coke transportation and storage facility, Texas Marine. Texas Marine was operating its facility under a permit from the Texas Air Control Board and it was already the subject of agency enforcement proceedings, based upon Manchester's complaints about petroleum coke emissions contaminating Manchester's facilities and stored goods. Manchester had also requested hearings before the agency on its complaint. (Unlike the Court in *Nader*, which observed that the plaintiff there had no right to initiate agency enforcement proceedings, the court here offered no opinion about Manchester's participation in the agency's administrative enforcement case. Although such a case may have been based on Manchester's complaints, it is likely that the agency took the position that Manchester would have no power to

Case 1:02-cv-00054   Document 10   Filed in TXSD on 04/17/2002   Page 48 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments

F-11

"initiate" the case and could serve only as a fact witness rather than in any prosecutorial role.)

The court held that Manchester could pursue its suit. The court relied on the exclusive jurisdiction test, citing *Delhi-Taylor*, 344 S.W.2d 411. The court recognized that the Air Control Board was the principal authority over the state's air quality issues, but held that it did not have exclusive jurisdiction over actions for injunctive relief and damages: to the contrary, §1.06 of the Texas Clean Air Act, Tex. Rev. Civ. Stat. Ann. art. 4477-5, expressly preserved the right of private parties to pursue all common law remedies to abate air pollution and recover damages. The court further opined that the issues raised by Manchester's pleading did not require the agency's administrative expertise. The court rejected Texas Marine's argument that granting relief to Manchester would nullify its permits and held that even if a regulatee holds a valid permit, the manner in which it performs activities can give rise to an action for injunctive relief or damages based on trespass or nuisance.

### d)    *Single Incident or Continuing Conduct?*

Another factor which has been determinative of whether the court will abate or dismiss an action based upon primary jurisdiction in a case alleging a common law cause of action is whether the conduct complained of is a single incident or is of a continuing nature. This was part of the reason the court in *Foree* did not defer to the agency. 431 S.W.2d at 317. *Shell Pipeline Corp.*, 788 S.W.2d 837, involved a suit for damages against a pipeline operator for negligence and breach of contract in the delivery of crude oil to the wrong consignee via a pipeline. The court held that the Federal Energy Regulatory Commission had neither exclusive nor primary jurisdiction over the issues in the case because although there was a tariff involved in the transportation of the oil over Shell's pipeline, the tariff was not the basis for the trial court's jurisdiction. Shell had discontinued the

practices that led to the delivery of oil to the wrong consignee, thus the case did not involve a continuing situation requiring regulatory oversight. The court reasoned that the uniformity of decisionmaking rationale underlying the doctrine of primary jurisdiction was inapplicable to a practice that had been discontinued.

The types of common law causes of action involved in cases in which primary jurisdiction has been raised are diverse. Given the inherently judicial nature of common law claims, when issues arise in this type of case that would be appropriate for an initial agency decision, abatement of court proceedings during the pendency of agency decisionmaking seems more appropriate than dismissal of the case. As *Kayal*, 923 S.W.2d 670, and several other cases considered in the next section illustrate, however, that has not always been the courts' resolution.

### B.    Agency Cannot Grant Relief Sought or Make Incidental Findings

Before relying on the inherently judicial exception to block application of agency primary jurisdiction to a common law cause of action, a party should consider this second exception to the doctrine.    The courts that have rejected application of the doctrine to common-law claims on the basis that these claims are "inherently judicial" because an agency cannot award damages or enjoin conduct have, in reality, applied this second exception but ignored the second prong. *See, e.g., Amarillo Oil*, 794 S.W. 2d 20.   Other cases involving common law causes of action have applied both parts of the exception; indeed, even the court in *Foree* applied both parts of the exception. A party should be prepared to meet both prongs of this exception in order to avoid the application of primary jurisdiction to abate or dismiss a court action.

This was illustrated rather dramatically in *Far East Conference*, 72 S.Ct. 492. There, the U.S. brought suit to enforce the Sherman Act to

Case 1:02-cv-00054     Document 10     Filed in TXSD on 04/17/2002     Page 49 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                    F-12

enjoin a dual-rate system used by an association of carriers engaged in foreign trade to charge a more favorable rate to shippers contracting to deal exclusively with the association's carriers. The Court held that before the U.S. could bring its enforcement case under the Sherman Act, the Federal Maritime Board, empowered to approve the dual-rate system under the Shipping Act, must be given an opportunity to determine the reasonableness of the rate system, under the Shipping Act. Unlike the prior cases involving primary jurisdiction, the court and agency proceedings would not apply the same statutes. Although the Maritime Board clearly could not grant the relief sought by the U.S., it could resolve essential issues in the enforcement case. The Court ordered dismissal of the suit.

*Foree*, 431 S.W.2d 312, arose as a suit for damages by oil producers against statutory common purchasers for unjust discrimination in the purchase of crude oil based on practices that favored the purchasers' own production over that of producers. During the pendency of the suit a Railroad Commission proceeding resulted in an order finding discrimination by the common purchasers and ordering them to extend and connect their pipelines to producers' wells. After the purchasers complied with the Commission's order, but still during the pendency of the suit, the Railroad Commission entered a second order withdrawing its original order. The Supreme Court held that the Commission did not have primary jurisdiction over producers' claim based upon this second exception because the Commission's authority to make findings on discrimination was limited to ongoing practices. The agency's action was mooted by the end of purchasers' discriminatory practices and the agency had no statutory basis upon which to make findings of past discrimination. Thus, the agency could neither grant the relief sought by the producers nor make incidental findings essential to the relief. The court saved "for another case and day" the issue of how this second exception might be applied in a case in which the agency is powerless to grant the relief

sought but does have the authority to make essential incidental findings.

The opportunity arose in *Toman*, 624 S.W.2d 677, for a court to address the situation where an agency had authority to make incidental findings, yet was powerless to order the remedy sought. A developer sought compensatory damages against individual members of a municipal utility district's (MUD's) board of directors. Prior to becoming board members, the individuals had opposed the sale of bonds to implement the sale of their subdivision's water utility to the MUD. The developer alleged, among other things, that upon their election to the board, the members withheld approval of the MUD's expansion to the subdivision, failed to call an annexation election, caused the removal of records from the MUD's offices, aided in the prosecution of a lawsuit against the developer, slandered him, interfered with his contractual relationship with a bank, and illegally filed a lien against the developer's lots. The trial court abated the developer's suit in deference to the "continuing right of supervision" over MUDs and their directors vested in the Department of Water Resources. On appeal, the court found that all except two allegations, slander and tortious interference with contract, fell within the agency's authority to make incidental findings essential to granting the relief sought. Thus, the agency had primary jurisdiction since the acts complained of were committed by the board members in their official capacity. The court affirmed the trial court's dismissal of all claims except slander and tortious interference with contract which it severed and remanded to the trial court. *See also, Jordan v. Staff Water Supply Corp.*, 919 S.W.2d 833 (Tex. App.-Eastland 1996, no writ). (Court held that severance and dismissal of stockholder/member's case alleging that water supply corporation failed to provide adequate and continuous service and challenging its water rate increases was proper because those claims fell within the Texas Natural Resource Conservation Commission's primary jurisdiction, but claim seeking a receivership to conserve corporation's

assets pursuant to Texas Non-Profit Corporation Act, Tex. Rev. Civ. Stat. Ann. art. 1396-7.05, was within trial court's jurisdiction and was improperly dismissed).

In both *Toman* and *Jordan*, rather than abate the court proceedings, the common law causes of action were ordered severed from agency proceedings. Depending on the timing involved as the trial courts move forward with the severed common law claims in such cases, incidental agency findings may be of no value to the parties in obtaining relief from the courts.

The 5th Circuit in *Penny*, 906 S.W.2d 183 (1990), achieved a better allocation of initial decisionmaking responsibilities between the agency and court by ordering the district court to hold in abeyance "for a reasonable time" plaintiff's case seeking damages against Southwestern Bell Telephone Co. under the Texas Deceptive Trade Practices Act (DTPA), Tex. Bus. & Comm. Code Ann. §17.01 *et seq.*, for misrepresentation, retaliation and the application of discriminatory rates where the Texas Public Utility Commission (PUC) could not address the first two claims or remedy past wrongs but was empowered to make findings incidental to the claim of rate discrimination. The court first determined that a decision as to whether the rates charged by Bell for the Pennys' on-line bulletin board service, which provided information exchange services through the use of telephone lines, were discriminatory in light of the lower rates charged to their competitors was not inherently judicial in nature, "as evidenced by the fact that the PUC has the power to make the determination. While the larger claim - whether Bell violated the DTPA by charging discriminatory rates - is certainly judicial in nature, the question of discrimination is not." *Id.* at 188. The first exception to primary jurisdiction for inherently judicial matters was held to be inapplicable. The second exception did not apply because the PUC was given broad powers to hold hearings and make findings and operated under a general mandate to prohibit discriminatory rates.

Thus, reasoned the court, the PUC could make findings incidental to the relief sought by the Pennys under their third claim.

*Penny* is also instructive in clarifying the distinction between an agency's exclusive jurisdiction and the doctrine of primary jurisdiction confused in *Delhi-Taylor*, 344 S.W.2d 411, *Foree*, 431 S.W.2d 312, and some subsequent cases. The trial court had dismissed the case for the Pennys' failure to "exhaust administrative remedies." The appellate court stated that this holding required a determination that the trial court had no original jurisdiction over the claims and that the PUC had exclusive jurisdiction. The 5th Circuit held that the dispute was outside the purview of the PUC's exclusive jurisdiction, however, for two reasons. First, the PUC had no authority to decide the misrepresentation and retaliation claims and ample case law established that the PUC did not have exclusive jurisdiction over tort claims against Bell. Second, although the PUC was empowered to regulate rates, it had no power to provide the remedy sought. "The fact that the PUC does not have exclusive jurisdiction over the Pennys' rate discrimination claim does not mean that it has no role to play in the adjudication of that claim." *Penny* at 186-7. Deferring to the agency's primary jurisdiction was found to be especially appropriate because the ultimate resolution of the case would benefit from the PUC's specialized knowledge gained through the agency's adjudication of rates and their application. Uniformity of decisionmaking in rate discrimination cases would also be served.

# V.  PRIMARY JURISDICTION AND A PRE-ENFORCEMENT RULE CHALLENGE

The interplay between the doctrine of primary jurisdiction and APA §2001.038, which allows a party to challenge an agency rule prior to its application to regulate the party's activities, has been controversial (Pete Schenkkan, When and How Should Texas Courts Review Agency

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 51 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                    F-16

In a footnote the court observed that an agency promulgation of a rule "will almost always constitute a 'decision' by the agency on the matter addressed by the rule. Accordingly, we are unable to envision a situation in which the primary-jurisdiction doctrine could apply in a proper section .038 challenge to the validity of a rule." *Id.* at 478 n. 4.

Some parties to the controversy over the relationship between primary jurisdiction and §2001.038 lose sight of the fact that primary jurisdiction is a discretionary doctrine that can be applied by a court in several ways to benefit the court's own decisionmaking. Neither *Arco* nor *ARA Living Centers* presented an appropriate opportunity for the Austin Court of Appeals to analyze whether, by enacting §2001.038, the legislature intended to take away the courts' discretion.

## VI.    CONSEQUENCES OF INVOKING PRIMARY JURISDICTION

In addition to the benefits already discussed that can result from referring issues for an agency's original determination (consistency of decisionmaking and application of agency expertise to issues involving regulated industries), there are at least two other significant consequences to invoking the doctrine of primary jurisdiction: the transfer of decisionmaking power to the agency and the harm to a party resulting from agency delay or inaction.

## A.    Agency decision approached with deference

A decision that an agency has primary jurisdiction over an issue or controversy operates to transfer decisionmaking power to the agency to a greater or lesser degree depending on the nature of judicial review of the agency's decision. In Texas, where the agency proceeding is a fact-based contested case hearing, many agency statutes provide for substantial evidence rather than *de novo* review of the case so that the court

may consider only the agency record, cannot substitute its judgment for that of the agency on the weight of the evidence on questions committed to agency discretion, and determines whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency. APA §2001.174; *Railroad Com'n v. Torch Operating*, 912 S.W.2d 790, 792 (Tex. 1995)("This is a limited standard of review that gives significant deference to the agency in its field of expertise."); *Texas Health Facilities Com'n v. Charter Medical - Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984).

Recent amendments to APA §2001.058(e) may shift decisionmaking power in contested cases to Administrative Law Judges at the State Office of Administrative Hearings and away from top agency administrators for some types of decisions. For a detailed discussion of recent trends in this area, the reader should consult Judge F. Scott McCowan, Agency Discretion to Make Findings and Conclusions in Contested Cases: Developments Following *Hunter Industrial Resources v. TNRCC*, 1997 Advanced Administrative Law Conference, September 1997. It remains to be seen if and how this development may come to affect application of the primary jurisdiction doctrine.

A court may defer its resolution of a case pending agency rulemaking rather than contested case hearing. In such a case, the court's review consists of determining whether the agency had statutory authority to promulgate the rule, whether the rule was promulgated according to proper procedure or whether the rule is unconstitutional. *Arco*, 876 S.W.2d 473. In general, a reviewing court has no authority to consider whether a rule is wise or unwise, desirable or necessary. *Bullock v. Hewlett Packard Co.*, 628 S.W. 2d 754 (Tex. 1982). Recently, however, as part of their review of agency rulemaking procedures, the courts are taking a harder look at whether the agency order adopting the rule has stated a "reasoned justification" for the rule as required by APA

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 52 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                                                                            F-17

§2001.033.    *National Ass'n of Independent Insurers v. Texas Dept. of Insurance*, 925 S.W.2d 667 (Tex. 1996).    This inquiry includes a determination of whether the rule accomplishes the legislative objectives of §2001.033 and comes fairly within the character and scope of each of the requirements of §2001.033 in specific and unambiguous terms. *Id.* at 669. This refinement in the judicial review of agency rulemaking procedures has already sent several agencies "back to the drawing board" in their regulatory efforts. *Id.*; *See also, Texas Hospital Ass'n v. Texas Workers Comp. Com'n.*, 911 S.W.2d 884 (Tex. App.-Austin 1995, writ denied).

**B.    Agency delay or inaction**

A second consequence of invoking primary jurisdiction that has proven to be a vexing problem is agency delay or inaction. This is especially true in the case of large federal agencies which may have notoriously limited resources and large numbers of Congressional mandates to implement. This can lead to serious decisionmaking delays with potential for great financial harm to the parties. For example, Davis and Pierce, §14.6, at 303, recount that after the court stayed its action in *Mississippi Power & Light Co.*, 532 F.2d 412, the agency's resolution of the dispute took 11 years.

In recent cases, concern over agency delays have led the federal courts to develop another factor in deciding whether to invoke primary jurisdiction. For example, the Fifth Circuit in *Wagner & Brown*, 837 F.2d at 201, stated that the court "must weigh the benefits of obtaining the agency's aid against the need to resolve the litigation expeditiously and may defer only if the benefits of agency review exceed the costs imposed on the parties." In that case the court was concerned not only with possible delay by the Federal Energy Regulatory Commission (FERC), but also with the agency's prior refusal to decide the issues before the court.    As a method of addressing both problems, the court

referred the issues to the FERC but stayed the court's own proceedings for only 180 days.

The 5th Circuit's resolution creates a balance that allows the court to reap the benefits of timely agency decisionmaking while avoiding harm to a party when an agency delays action or refuses to act. Commentators Davis and Pierce discuss other methods courts have used to address potential delays. §14.6, at 303-4. (A court may seek an amicus brief from an agency or decide an issue for purposes of resolving the case before it but leave open the possibility of a later agency decision that would change the result in future cases. This latter approach is sometimes applied to invite legislative correction of a problem.)

**VII.    RECENT DEVELOPMENTS**

Increasingly the primary jurisdiction of the Texas Department of Insurance is being asserted by insurance companies in defending against common law causes of action such as breach of contract, fraudulent misrepresentation, and negligence and violations of the Insurance Code in suits brought by policyholders or third parties.    Two recent examples of class action lawsuits are illustrative.    Plaintiffs in *Amando Martinez et al. v. Allstate Insurance Co. and Fralian Sendejo, et al. v. Texas Farmers Insurance Company, et al.*, No. 95-08-09165-CV, 365th District Court of Zavala County, sought damages for breach of their insurance contracts based upon the insurers' violation of Tex. Ins. Code Ann. art. 5.101, §3(k) which requires the insurers to comply with Rules 7 and 9 of the Texas Automobile Rules and Rating Manual (the Auto Manual) promulgated by the Department of Insurance. The Auto Manual instructed insurers how to round their annual premium for private-passenger auto insurance to the nearest whole dollar for both one year (or more) and six-month auto policies. Plaintiffs alleged the insurers were "double rounding" the amount of premium charged for six-month auto insurance policies in violation of the Department's Auto Manual.

Case 1:02-cv-00054     Document 10     Filed in TXSD on 04/17/2002     Page 53 of 58

Courthouse or Agency?
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments                                    F-18

The trial court denied the insurers' pleas to the jurisdiction, motions to dismiss and pleas in abatement. The insurers petitioned the Texas Supreme Court for writ of mandamus and/or writ of prohibition, Supreme Court No. 96-0553, based on separation of powers and the doctrines of primary jurisdiction and exhaustion of administrative remedies. (Insurers urged applicability of the latter doctrine even though the Department had no ongoing administrative proceeding concerning the issues in the suit.) The companies argued that failure to dismiss or abate the suit under the doctrine of primary jurisdiction would undermine the uniform application of the Auto Manual rules and thus the application of auto rates. Plaintiffs argued that while the agency had exclusive jurisdiction to make insurance rates and rules, it did not have exclusive jurisdiction to adjudicate breach of contract actions between private parties, inherently judicial issues, or award the damages sought. The Supreme Court overruled the insurers' Motion for Leave to File Petition for Writ of Mandamus. The case ultimately was settled.

*William and Christine Korte and Levin and Aimee Sapp et al. v. Allstate Insurance Company and Allstate Indemnity Company*, No. 5-97CV0165 (E.D. Texas, filed June 19, 1997) is pending as of this writing. Plaintiffs are seeking actual and exemplary damages for violations of Tex. Ins. Code. Ann. arts. 1.10, §7(a); 5.101, §3(f) and 21.21, breach of contract, negligence and fraudulent misrepresentation based upon the alleged overcharging of private-passenger auto rates and using the excess premium to subsidize the rates of Allstate's policyholders in the state's "required [high] risk pool" (TAIPA rate subsidy.) TAIPA, Texas Automobile Insurance Plan Association, is the name of the required risk pool plan to which auto insurers must belong as a condition for writing auto insurance in Texas. Under TAIPA, insurers must cover persons who have been rejected by at least two auto insurers. TAIPA rates are revised by the Commissioner of insurance annually.

Allstate's alleged TAIPA rate subsidy is the subject of ongoing agency contested case proceedings initiated March 6, 1997, based upon the Commissioner of Insurance's challenge to this and other components of Allstate's private-passenger auto rates brought pursuant to Tex. Ins. Code Ann. art. 5.101, §3(f). In the administrative proceedings, the agency is also seeking restitution for Allstate's policyholders for the TAIPA rate subsidy and other components of Allstate's auto rate package, which the agency has alleged are excessive, pursuant to Tex. Ins. Code Ann. art. 1.10, §7. The Office of Public Insurance Counsel has intervened in the administrative proceeding. Allstate has filed a Motion to Dismiss, or In the Alternative, To Stay Proceedings in the federal court based upon the doctrine of primary jurisdiction. The court has not yet ruled on Allstate's Motion.

## VIII. EVALUATING A PRIMARY JURISDICTION QUESTION; IN A NUTSHELL

As can be surmised from the cases surveyed in this paper, it can be difficult to predict the outcome of a primary jurisdiction question. Generally, the federal courts have been more willing than our state courts to give an agency "the first word" when judicial and regulatory decisionmaking authority overlap. Federal courts are beginning to circumscribe their application of the doctrine, however, based on concerns over injury to a party resulting from delays in decisionmaking or inaction on the part of large federal agencies. What can be gleaned from federal and state cases, past and present, however, are factors to consider in evaluating how a court might exercise its discretion when primary jurisdiction is raised. These factors include: the nature of the issues before the court (whether issues are technical, fact-based, involve statutory construction or other questions of law); the effect on uniformity of court versus agency decisionmaking; the nature of the relief sought; whether the agency is empowered to make findings incidental to the relief sought; whether

Case 1:02-cv-00054    Document 10    Filed in TXSD on 04/17/2002    Page 54 of 58

Courthouse or Agency?
**Primary Jurisdiction and Exhaustion of Administrative Remedies —**
**Origins, Trends and Developments**                                                    F-19

the issues arise from a single event or from ongoing activity requiring continuing agency supervision; whether an agency determination will materially aid the court's decisionmaking; whether the agency is presently involved in an issue that will directly impact the litigation, whether an agency determination will immunize a party from liability in the lawsuit and whether anticipated agency delay or inaction would harm the parties.

Two commentators observed that the primary jurisdiction doctrine is most likely to be applied in cases concerning more highly regulated industries, but that "[I]n the end, however, invocation of the doctrine is highly discretionary and seems to depend on whether the court actually feels out of its depth as it confronts the issues raised by the parties." E. Gellhorn, R.M. Lewis, ADMINISTRATIVE LAW AND PROCESS IN A NUTSHELL, Ch. 10 at 390 (3d ed. 1990).

It is hoped the commentators are wrong as to their second observation. Decisions about whether to apply this doctrine should be based upon careful analysis and weighing of the relevant factors rather than being merely conclusory or opportunistic. Primary jurisdiction is intended to be a flexible doctrine that can be used to adapt the roles of courts and agencies as required by changes in legislation, or to take into account the lessons of experience in allocating decisionmaking authority to either institution. Courts should consider the benefits to be derived from the contemplated allocation of decisionmaking responsibility, the effect of the allocation on a legislatively created regulatory scheme and whether the allocation will be fair to the parties.

## IX.    EXHAUSTION OF ADMINISTRA-TIVE REMEDIES

The exhaustion of administrative remedies doctrine is well established in administrative law jurisprudence. The doctrine

has been written about quite thoroughly in the past as part of this course. For detailed discussions about this doctrine, its origins, applicability and the exceptions to it the reader is referred to the following:  Thomas M. Pollan, Extraordinary Judicial Remedies (Or What Happens When the Agency Runs Amok), 6th Annual Advanced Administrative Law Course, September 1994 at "U"; Hon. Bob Shannon, Chief Justice, Third Court of Appeals (Retired), Extraordinary Judicial Remedies, 7th Annual Advanced Administrative Law Course, September 1995 at "S"; Dewey E. Helmcamp, III, Extraordinary Judicial Review, 8th Annual Advanced Administrative Law Course, September 1996 at "R." The present paper will not revisit the detail presented in those papers but will explore two areas: how exhaustion of administrative remedies compares to and is different from the doctrine of primary jurisdiction, and two recent opinions from Texas courts of appeal applying the exhaustion of administrative remedies doctrine to dismiss cases involving common law claims where statutes mandated initial agency decisionmaking.

### A.    Compared to and Distinguished from Primary Jurisdiction

The exhaustion of administrative remedies doctrine is, like the doctrine of primary jurisdiction, a doctrine of comity between courts and administrative agencies.  Whereas primary jurisdiction determines whether an agency has *initial* jurisdiction; exhaustion of remedies determines whether a court has jurisdiction to *review* agency action. The exhaustion doctrine is this: that no one is entitled to judicial review of agency action until the prescribed administrative remedy has been exhausted.  APA §2001.171; *Texas State Board of Examiners in Optometry v. Carp*, 343 S.W.2d 242 (Tex. 1961).  Primary jurisdiction applies where the court and the agency have concurrent jurisdiction over a dispute or issues raised in it; exhaustion of administrative remedies applies where the agency has exclusive jurisdiction. *Western Pacific*, 77

S.Ct. 161, 164; *Southwestern Bell Telephone Co. v. Public Utility Com'n of Texas*, 735 S.W.2d at 669 n.3.

The reasons for applying the doctrine of exhaustion of administrative remedies are 1) to prevent premature judicial interference with an agency proceeding in which there are issues of fact which require the application of agency expertise, experience or policy for their proper resolution; 2) to avoid the use of judicial time and resources to resolve preliminary disputes that may be resolved or may become immaterial as the agency proceeds; and 3) to maintain the authority of an agency to resolve disputes by giving the agency a chance to correct its own errors before parties resort to the courts. *Public Utility Com'n of Texas v. Pedernales Elec. Co-op., Inc.*, 678 S.W.2d 214, 220 n.3 (Tex. App.-Austin 1984, writ ref'd n.r.e.).

These reasons, which have to do with reconciling the roles of courts and agencies, bear similarities to the reasons underlying the primary jurisdiction doctrine (to promote uniformity of decisionmaking over regulatory issues and to assure that agencies are not passed over in matters involving issues of fact within their discretion and expertise.) The differences in the reasons underlying the two doctrines have to do with the timing of the judicial inquiry into whether to apply either doctrine (whether the court is determining if it should defer to an agency's initial decisionmaking or whether the court is deciding if it should review ongoing agency action).

There is also some overlap in the exceptions to both doctrines. The exceptions to the doctrine of exhaustion of administrative remedies are: 1) lack of jurisdiction in the agency (*Westheimer Independent School District*, 567 S.W.2d at 785); 2) when the only issue raised is a pure question of law (*Grounds v. Tolar Ind. School Dist.*, 707 S.W.2d at 892) or the constitutionality of a statute (*Walgreen*, 520 S.W.2d at 848); 3) the administrative remedy is

inadequate to avoid irreparable injury (*Houston Federation of Teachers, Local 2415 v. Houston Independent School District*, 730 S.W.2d 644 (Tex. 1987)); 4) where the agency has issued a void order (*State Line Consolidated School District v. Farrell Independent School District*, 48 S.W.2d 616 (Tex. Comm'n App 1932, judgm't adopted). The first and second exceptions have been used in cases applying the primary jurisdiction doctrine. The fact that the doctrines of primary jurisdiction and exhaustion of administrative remedies both concern the proper relationship between courts and agencies, which accounts for the overlap in reasons said to underlie the doctrines and certain exceptions applied to both, has led one commentator to observe that the doctrines are really "two sides of the timing coin." Schwartz §8.26 at 524. Understanding the timing that applies to each doctrine is important, however, to avoid confusion over their applicability. *See, e.g., Arco*, 876 S.W.2d at 478.

**B.     Where Statutory Scheme Requires Exhaustion: Recent Case Law**

Two recent cases applied the exhaustion of administrative remedies doctrine to dismiss plaintiffs' common law claims where statutes established mandatory and exclusive administrative procedures that plaintiffs failed to follow. *Producers Assistance Corp. v. Employers Ins. of Wausau*, 934 S.W.2d 796 (Tex. App.-Houston [1st Dist.] 1996, no writ); *Metro Temps, Inc. and Metromarketing Services, Inc. v. Texas Worker's Compensation Insurance Facility et al.*, No. 3-96-256-CV (Tex. App.-Austin July 24, 1997, n.w.h.) The agencies, were not empowered to grant the relief sought (damages) in these cases, but were authorized to decide some of the issues underlying the common law claims. Neither case involved judicial review of an agency action, the circumstance in which the exhaustion of administrative remedies doctrine is traditionally applied. Instead, the exhaustion of remedies doctrine was used to avoid decisionmaking by the courts where a statutory scheme required certain matters to be decided

Case 1:02-cv-00054   Document 10   Filed in TXSD on 04/17/2002   Page 56 of 58

Courthouse or Agency?
**Primary Jurisdiction and Exhaustion of Administrative Remedies —**
**Origins, Trends and Developments**                                                 F-21

initially by the agencies. At first blush these cases appear to be another departure by our state courts from federal courts in circumstances in which the doctrine of primary jurisdiction would have been more properly applied. *See, Penny,* 906 F.2d 183; *Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 69 F.3d 1304 (5th Cir. 1995). The two state court cases, however, follow a line of Texas cases holding that where a party's cause of action and remedies sought are derived from a statute, the party's failure to follow the procedures outlined in a statute before coming to court deprives the court of subject-matter jurisdiction. *See, e.g., Texas Catastrophe Property Ins. Ass'n v. Council of Co-Owners of Saida II Towers,* 706 S.W.2d 644 (Tex. 1986); *Stephanou v. Texas Medical Liability Ins. Underwriting Ass'n (JUA),* 792 S.W.2d 498 (Tex. App.-Houston [1st Dist.] 1990, writ denied).

Both *Producers Assistance* and *Metro Temps* addressed a situation in which a plaintiff brought common law causes of action seeking damages based upon complaints about their workers' compensation insurance policies. In *Producers Assistance* an employer sought damages against the workers' compensation insurance carrier for breach of duty of good faith and fair dealing, negligence, gross negligence, intentional infliction of emotional distress, breach of contract, fraud, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act (DTPA), based on the carrier's denial of coverage of an employee's personal injury claim. Wausau, the insurance carrier, was acting as a "servicing agent" to administer the policy for the Texas Workers' Compensation Assigned Risk Pool, which provided insurance coverage for employers who are unable to obtain insurance in the voluntary market. Texas Insurance Code art. 5.76 provided that an applicant for insurance aggrieved by an act of the risk pool could appeal to the State Board of Insurance not later than the 30th day after the act occurred. Insurance Code art. 1.04 provided for an appeal to district court by a party aggrieved by the Board's decision, regulation, rate, rule, act or

administrative ruling by the Board. Plaintiff had not sought administrative relief under the Insurance Code within the statutory time limit.

The court held that plaintiff must first exhaust the administrative remedies under the statutory scheme even though the Board of Insurance could not adjudicate or provide full relief for all of plaintiff's claims. The court reasoned that the agency had special expertise to apply to the matters at hand, and that agency resolution of the issues before it might result in resolution of the remaining matters in the case. The court sustained the trial court's dismissal for want of subject matter jurisdiction.

The plaintiffs in *Metro Temps* obtained a workers' compensation policy for which modifiers and surcharges were applied before the anniversary date contrary to language in a binder to the policy resulting in plaintiffs being charged a substantially higher premium. They sought a declaratory judgment that they would not owe the higher premium and raised claims for breach of contract, fraud and conspiracy and breach of duty of good faith and asserted they were entitled to punitive damages. As in *Producers Assistance,* neither plaintiff had sought a Board of Insurance decision under Insurance Code 5.76-2 within 30 days after an act or decision by the (now called) Texas Workers' Compensation Insurance Facility. The court determined that the Board of Insurance had jurisdiction over plaintiffs' claims regarding the amount of the premium charged and, in the case of one plaintiff, whether a premium was due. The court held:

> [w]here, as here, the administrative remedies are available for a portion of the plaintiff's claims and the resolution of that portion of the claims may be determinative of the claims over which the administrative body has no jurisdiction, the trial court does not have jurisdiction over the claims outside the jurisdiction of

Case 1:02-cv-00054   Document 10   Filed in TXSD on 04/17/2002   Page 57 of 58

Courthouse or Agency?  ·
Primary Jurisdiction and Exhaustion of Administrative Remedies —
Origins, Trends and Developments

F-22

the administrative body until the plaintiff has exhausted its administrative remedies with respect to the claims over which the administrative body does have jurisdiction.

The court affirmed the trial court's order dismissing the causes of action.

Because the courts applied the exhaustion of administrative remedies doctrine in both of these cases, the result was dismissal of the plaintiffs' common law causes of action. The 5th Circuit applied the doctrine of primary jurisdiction in a similar case, *Northwinds*, 69 F.3d 1304, with the result that plaintiff's common law causes of action were abated not dismissed.

*Northwinds* also involved common law causes of action involving a workers' compensation policy issued by the Texas Workers' compensation Insurance Fund. Northwinds sued the servicing company, Wausau, for actual, exemplary and treble damages for breach of the insurer's duty of good faith and fair dealing, breach of fiduciary duty, negligence, gross negligence, unfair settlement practices, misrepresentation, breach of contract and violations of the DTPA and Texas Insurance Code. Northwinds alleged that Wausau paid four claims that were fraudulent without investigating the claims resulting in increased premium and eventual cancellation of its workers' compensation policy. Northwinds, a company in the business of asbestos abatement remediation and removal, also alleged that the improper payments increased its experience modifier rate, thereby harming its ability to compete for asbestos abatement contracts. Before filing its lawsuit in federal court, Northwinds had sought review of its complaint by the Department of Insurance and the Texas Workers' Compensation Commission and, at the time of appeal was awaiting final agency findings.

Wausau argued that the doctrines of exclusive jurisdiction and exhaustion of administrative remedies applied because Tex. Ins. Code. Ann. art. 5.76-2 provided exclusive administrative remedies for employers. Northwinds argued that those doctrines did not apply because the Board and the Commission were not empowered to award Northwinds the damages it sought for past tortious actions by Wausau. Northwinds argued that the doctrine of primary jurisdiction applied instead and urged the court to use the agency's findings to adjudicate Northwind's damages.

The court agreed with Northwinds in light of the court's holdings in *Penny*, 906 F.2d 183. Neither the Board of Insurance nor the Workers' Compensation Commission were empowered by statute to adjudicate tort and contract claims or to award damages. These agencies could only find that the claims should not have been paid and to order adjustment of Northwind's experience modifier rates. Thus, exclusive jurisdiction did not rest in the agencies and the court had original jurisdiction of Northwind's claims for damages. The court further held that the doctrine of primary jurisdiction would apply because Northwind's damages claims rested on findings the agencies, applying their special expertise, had the authority to make. The court reversed, in part, the trial court's granting of summary judgment, and remanded the case to the trial court with instructions to abate proceedings pending the agencies' findings.

The difference between the two state court cases and *Northwinds* was the procedural circumstances of the plaintiffs. In *Northwinds*, the company had begun pursuing the statutorily required administrative remedies within the statutory time frame. Abatement of the court proceedings was thus appropriate. In *Metro Temps* and *Producers Assistance*, it was too late for plaintiffs to pursue agency proceedings. Even under these procedural circumstances, however, had the state courts followed the 5th Circuit's determination that the Insurance Code provisions did not confer exclusive jurisdiction on the

administrative agencies but that the agencies had primary jurisdiction, could the courts have exercised their discretion to allow plaintiffs to pursue their common law claims in court? The holdings in *Delhi-Taylor Oil Corp.*, 344 S.W.2d 411 and *Amarillo Oil Corp.*, 794 S.W.2d 20, along with the test articulated in *Foree*, 431 S.W.2d 312, discussed in section IV.2.b, suggest they could. Such a result, however, would not only undermine the legislature's intent in imposing a requirement for agency review within a specified time limit but, in a larger sense, would also frustrate the theme of comity between courts and agencies that underlies the doctrines of primary jurisdiction and exhaustion of administrative remedies. The use of the exhaustion of administrative remedies doctrine by the courts in *Metro Temps* and *Producers Assistance* in the "non-traditional" way, in other words, in cases that do not involve judicial review of agency action, may lead to more confusion about when to apply this doctrine and the other doctrines establishing the proper relationships between courts and agencies. Any confusion created by courts relying on the "exhaustion of administrative remedies" doctrine in such cases could be avoided by basing the holdings on "exclusive jurisdiction" or by simply holding that the a plaintiff's failure to initiate agency proceedings or otherwise follow procedures mandated by a statute deprives the court of subject-matter jurisdiction.

## X.    CONCLUSION

The closely related doctrines of primary jurisdiction and exhaustion of administrative remedies are applied to answer questions about timing of agency versus court decisionmaking. It is important to understand the differences between the two doctrines and how they are applied.

Primary jurisdiction is a highly discretionary doctrine applied when agency and court have concurrent jurisdiction. Because it is discretionary, it can be difficult to discern patterns in cases applying this doctrine. The

cases do provide some assistance: they have established factors to be considered in analyzing a primary jurisdiction question. The doctrine is applied in a flexible manner so that if a court chooses to defer to agency initial decisionmaking, it may dismiss or abate court proceedings.

Unless an exception to the exhaustion of administrative remedies doctrine applies, that doctrine deprives a court of jurisdiction until a party pursues all remedies available to it at an agency. The doctrine is generally applied to determine the appropriateness of judicial review of an agency decision. It has also been applied to deprive a court of subject-matter jurisdiction where a statute mandates initial agency decisionmaking. Where no exception to this doctrine applies, a court must dismiss its proceedings for want of jurisdiction.

The doctrines of primary jurisdiction and exhaustion of administrative remedies are often confused. (One wonders whether this is because one doctrine is a jurisdictional matter which lacks the word "jurisdiction" in its name, and the other is a discretionary matter whose name includes the word "jurisdiction.") It is hoped that this paper will help reduce the confusion.

---

*The views expressed in this paper
are those of the author.*