United States District Court
Southern District of Texas
FILED

JUL 0 8 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ACCUTEL OF TEXAS, INC.,
BUY-TEL COMMUNICATIONS, INC.,
DIAMOND TELCO, INC.,
MAX-TEL COMMUNICATIONS, INC.,
QUICK-TEL COMMUNICATIONS, INC.
R TEX COMMUNICATIONS GROUP INC.,
ROSEBUD COTTON COMPANY,
ROSEBUD TELEPHONE, LLC, and
TIN CAN COMMUNICATIONS CO., LLC,

PLAINTIFFS,

VS.

SOUTHWESTERN
BELL TELEPHONE, L.P.

DEFENDANT.

CIVIL ACTION NO. B-02-054

**SOUTHWESTERN BELL TELEPHONE, L.P.'S NOTICE TO THE COURT
CONCERNING STATUS OF PROCEEDINGS AND FEDERAL COURT APPEAL**

TO THE HONORABLE JUDGE:

Southwestern Bell Telephone, L.P. ("SWBT") respectfully notifies the Court that on June 17, 2002, SWBT filed an original appeal in the United States District Court for the Western District of Texas, San Antonio Division styled *Southwestern Bell Telephone, L.P. v. The Public Utility Commission of Texas, et al.*, SA02CA0571 (EP). Attached as Exhibit A is a true and correct copy of the Complaint (the "FTA Case"). The attached copy does not include Exhibits. The FTA Case was filed pursuant to Section 252(e)(6) of the Federal Telecommunications Act ("FTA")[1], appealing certain actions taken by the Public Utility Commission of Texas ("PUCT") in

---

[1] Pub. 1, No. 104-104, 100 Stat. 56 (1996) (codified as amended in scattered sections of 47 U.S.C.) (hereinafter "FTA"). Section 252(e)(6) of the FTA provides: "In any case in which a State commission makes a determination under this section [47 U.S.C. §252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the [interconnection] agreement ... meets the requirements of section 251 of this title and this section [47 U.S.C. § 252]."

approving an Interconnection Agreement between AccuTel of Texas, Inc. ("AccuTel"), the plaintiff in this case, and SWBT, the defendant. AccuTel is a named defendant in the FTA Case.

SWBT brings this matter to the Court's attention because in SWBT's pending motion to dismiss before this Court, SWBT argues that the §252(e)(6) federal court appeal -- now filed as the FTA Case -- will adjudicate the very legal issues under §§251(b)-(c) and 252 that will determine the outcome of this case as well.

Respectfully submitted,

By: _____
Javier Aguilar
State Bar No. 00936300
Southern District of Texas Bar No. 3429
Geoffrey Amsel
Attorney in Charge
State Bar No. 01161570
Southern District of Texas Bar No. 22716
Southwestern Bell Telephone, L.P.
1010 N. St. Mary's, Room 1400
San Antonio, Texas 78205
Telephone: (210) 886-4800
Telecopier: (210) 222-7194

Eduardo Roberto Rodriguez
Texas State Bar No. 17144000
Southern District of Texas Bar No. 1944
Mitchell C. Chaney
Texas State Bar No. 04107500
Southern District of Texas Bar No. 1918
R. Patrick Rodriguez
Texas State Bar No. 24002861
Southern District of Texas Bar No. 22949
Rodriguez, Colvin & Chaney, L.L.P.
1201 East Van Buren Street
Post Office Box 2155
Brownsville, Texas 78522
Telephone: (956) 542-7441
Telecopier: (956) 541-2170
ATTORNEY FOR DEFENDANT,
SOUTHWESTERN BELL TELEPHONE, L.P.

**CERTIFICATE OF SERVICE**

On this 27th day of June, 2002, a true and correct copy of foregoing **Southwestern Bell Telephone, L.P.'S Advisory to the Court Concerning Status of Proceedings and Federal Court Appeal** was served by certified mail, return receipt requested upon the following attorneys of record:

Mark Foster
Christopher Malish
Foster & Malish, LLP
1403 West Sixth Street
Austin, Texas 78703

Gilberto Hiñojosa
Magallanes, Hiñojosa & Mancias
1713 Boca Chica Blvd.
Brownsville, Texas 78703

_____
Geoffrey Amsel

# Exhibit "A"

RECEIVED
JUN 17 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SOUTHWESTERN BELL  §
TELEPHONE, L.P.,  §
 §
 §
      Plaintiff,  §
 § CIVIL ACTION NO.
V.  §
 § **SA02CA0571**
THE PUBLIC UTILITY COMMISSION  §
OF TEXAS; REBECCA KLEIN, IN HER  §
OFFICIAL CAPACITY as CHAIRMAN  §
of the Public Utility COMMISSION OF TEXAS;  §
BRETT PERLMAN, IN HIS OFFICIAL  §
CAPACITY AS COMMISSIONER OF THE  §
PUBLIC UTILITY COMMISSION OF TEXAS;  §
ACCUTEL OF TEXAS, INC., d/b/a  §
1-800-4-A-PHONE,  §
 §
      Defendants.  §



## COMPLAINT

1. Plaintiff, Southwestern Bell Telephone, L.P., d/b/a Southwestern Bell Telephone Company ("SWBT") seeks review of certain determinations of the Public Utility Commission of Texas (the "Texas Commission") and of the Commissioners of the Texas Commission made pursuant to the Federal Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of Title 47, United States Code) (the "1996 Act").

### Parties, Jurisdiction, and Venue

2. SWBT is a Texas limited partnership with its principal place of business in San Antonio, Texas. SWBT provides local telephone service in territories throughout the State of Texas and in other States.

3.  Defendant Texas Commission is an agency of the State of Texas. The Texas Commission is a "State commission" within the meaning of 47 U.S.C. §§ 153 (41), 251, and 252. The Texas Commission may be served through its Chief of Office of Policy Development, Lane Lanford, at 1701 N. Congress Ave., Austin, Texas 78701.

4.  Defendant Rebecca Klein is Chairman of the Texas Commission. Chairman Klein is sued in her official capacity for declaratory and injunctive relief only.

5.  Defendant Brett Perlman is a Commissioner of the Texas Commission. Commissioner Perlman is sued in his official capacity for declaratory and injunctive relief only.

6.  On information and belief, defendant AccuTel of Texas, Inc., d/b/a 1-800-4-A-PHONE ("AccuTel") is a Texas corporation with its principal place of business in Dallas, Texas. AccuTel provides local telephone service in the State of Texas. AccuTel may be served through its registered agent, Mark Foster, at 1403 West Sixth St., Austin, Texas 78703.

7.  This Court has subject matter jurisdiction over the action pursuant to the judicial review provision of the 1996 Act, 47 U.S.C. § 252(e)(6). In addition, this action arises under federal law. *See* 28 U.S.C. § 1331.

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391. Venue is proper under section 1391(b)(1) because Defendants Rebecca Klein and Brett Perlman (the "Commissioner Defendants") reside in this district. Venue is proper under section 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district, in which the Texas Commission sits and in which SWBT has its principal place of business.

### The 1996 Act and the Role of Interconnection Agreements

9.  Until the 1990s, local telephone service was generally provided in Texas and in other states by a single, highly regulated company (such as SWBT) that held a certificate of

2

convenience and necessity from the state or locality to provide such service. Congress enacted the 1996 Act in order to replace this system of exclusive state certification with market competition in the provision of local telecommunications service. *See* 47 U.S.C. §§ 251-253.

10. As Congress explained, the 1996 Act creates a "pro-competitive, de-regulatory" framework for the provision of telecommunications services. S. Conf. Rep. No. 104-230, at 113 (1996). To achieve that goal, Congress not only preempted exclusive state and local franchise arrangements (*see* 47 U.S.C. § 253), but also placed certain duties on local exchange carriers ("LECs"), *see id.* § 251(b), and special affirmative duties on *incumbent* LECs ("ILECs") like SWBT, *see id.* § 251(c).

11. Under 47 U.S.C. § 251(c)(2), incumbent LECs have a duty to "interconnect" their networks with the facilities of other LECs, enabling their respective customers to make calls to, and receive calls from, one another's networks. Incumbents also have a duty to negotiate interconnection agreements with competitive local exchange carriers ("CLECs"), companies such as AccuTel, that seek to enter the local market. *See id.* § 251(c)(1). An interconnection agreement defines the terms and conditions of an incumbent's relationship with another carrier under the 1996 Act.

12. If an incumbent LEC and a CLEC are unable to agree on all of the terms of an interconnection agreement, either party to the negotiation may petition the appropriate state commission to resolve any "open issues." *Id.* § 252(b)(1). The state commission must resolve those issues in accordance with the requirements of the 1996 Act. *See id.* § 252(c), (e). The state commission's determinations under section 252 are explicitly subject to review in federal court. *See id.* § 252(e)(6).

### Unbundled Network Elements and Resale of Telecommunications Services

13.   The 1996 Act requires incumbent LECs such as SWBT to provide CLECs with nondiscriminatory access to pieces of the incumbent's network. Section 251(c)(3) of the 1996 Act establishes the obligation to provide access to so-called unbundled network elements ("UNEs").

14.   In addition to the obligation to provide access to unbundled network elements, an incumbent LEC must also make available to CLECs, at a wholesale discount, any telecommunications service that the incumbent provides at retail, so that the CLEC may resell that service to its own end-user customers. Section 251(c)(4) of the 1996 Act establishes the obligation to make retail telecommunications services available for resale.

15.   The 1996 Act provides for separate pricing standards for unbundled network elements and for resold services. The price of an unbundled network element must be "based on the cost . . . of providing the . . . network element." *Id.* § 252(d)(1)(A)(i). The FCC has interpreted this statutory provision to require state commissions to establish prices for each network element that an ILEC must provide as an unbundled network element, or UNE, based on the total element long-run incremental cost ("TELRIC") of that element. Under TELRIC, rates are based not on the actual cost of the network element to the ILEC, but instead "on the use of the most efficient telecommunications technology currently available" and, with one exception not relevant here, "the lowest cost network configuration." 47 C.F.R. § 51.505(b)(1); *see also Verizon Communications Inc. v. FCC*, 122 S. Ct. 1646, 1676 (2002) (TELRIC "rates are figured by reference to a hypothetical element instead of an incumbent's actual element").

16. In contrast to the TELRIC methodology of setting rates for unbundled network elements, the process for setting wholesale rates for purposes of the resale requirement begins with the retail rate that the incumbent actually charges: "wholesale rates [shall be determined] on the basis of retail rates charged to subscribers for the telecommunications service, . . . excluding the portion thereof attributable to any . . . costs that will be avoided by the local exchange carrier." 47 U.S.C. § 252(d)(3); *see also Verizon*, 122 S. Ct. at 1663 n.15 ("Rates for wholesale purchases of telecommunications services are covered separately [in the Act], and must be based on the incumbent's retail rates.") (citation omitted).

17. The FCC has consistently recognized that the pricing standards for unbundled network elements and for resale are entirely different. "The 1996 Act requires that wholesale rates be based on existing retail rates, and thus clearly precludes use of a 'bottom up' [cost-based] study to establish wholesale rates that are not related to the rates for the underlying retail services. We thus reject the suggestions of those parties that ask us to require use of [a cost-based study] to set wholesale rates." First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, 15957, ¶ 915 (1996) ("*Local Competition Order*") (subsequent history omitted); *see also id.* at 15661, ¶ 317 (noting that "different pricing standards under section 252(d) apply to unbundled network elements under section 251(c)(3) and resold services under section 251(c)(4)").

18. The distinction between the pricing methodologies for resale and for unbundled network elements is significant because it offers CLECs a choice of entry strategy depending on the condition of the relevant market. So, for example, where the incumbent's state-established retail price for a telecommunications service is so low that a CLEC is unable to compete by providing the service through cost-based unbundled network elements, the CLEC is nevertheless

5

able to compete by obtaining the service at a wholesale discount off of the retail rate. As the FCC has explained, "the distinction between how UNEs and resale are priced . . . ensures that resale provides a profit margin where . . . the costs of individual elements exceed the [incumbent LEC's] retail rate." Memorandum Opinion and Order, *Joint Application by BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc for Provision of In-Region, InterLATA Services in Georgia and Louisiana*, CC Docket No. 02-35, FCC 02-147, ¶ 287 (rel. May 15, 2002).

19. Although prices for unbundled network elements are set on an element-by-element basis, state commissions have the choice of setting wholesale prices based on "a single, uniform discount rate for all of an incumbent LEC's services" or on "nonuniform wholesale discount rates" based on the "avoided costs . . . attributable to each service or group of services." *Local Competition Order*, 11 FCC Rcd at 15957-58, ¶ 916; *see also* 47 C.F.R. §§ 51.607-51.611.

20. Pursuant to the FCC's regulations implementing the 1996 Act, in 1997, the Texas Commission established the prices that SWBT could charge for both unbundled network elements and for wholesale services available for resale. Based on SWBT's cost studies using the TELRIC methodology, the Texas Commission established a comprehensive list of rates for unbundled network elements. In addition, the Texas Commission established a wholesale discount for those telecommunications services that SWBT offered at retail, calculated based on the retail costs SWBT could reasonably avoid as a wholesale provider. The Commission elected to establish a single, aggregate, avoided-cost discount of 21.6 percent off the retail price of all telecommunications services provided in Texas rather than setting a specific discount for each category of service. In 1999, SBC agreed, as part of the SBC/Ameritech Merger Conditions,

temporarily to increase the wholesale discount to 32 percent; the wholesale discount is currently 23.76 percent.[1]

### The Proceedings Below

21. AccuTel is a CLEC that operates in Texas pursuant to both an interconnection agreement, which contains the terms and conditions for the ordering and provisioning of unbundled network elements, and a separate Resale Agreement, which contains the terms and conditions for the ordering and provisioning of resold services. The parties executed the Resale Agreement on November 10, 1999, and the Texas Commission approved that agreement on January 12, 2000.[2]

22. The terms and conditions in these agreements include the prices that AccuTel is required to pay for the products and services it orders. For example, AccuTel's Resale Agreement provides that, if AccuTel were to seek to resell SWBT's retail Local Plus® telephone service in order to serve a residential end user who has recently moved to a new home in San Antonio and who is not currently receiving local exchange service (a so-called "new connect"), it must pay SWBT a one-time charge of $40.37 and a monthly fee of $24.36.[3] These charges correspond to the retail, tariffed non-recurring charge of $52.95 and the monthly rate of $31.95 that the San Antonio resident would pay if he ordered that same service from SWBT, less the

---

[1] See Memorandum Opinion and Order, *Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, For Consent To Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules*, 14 FCC Rcd 14712, 14875, ¶ 392, 15015, App. C, ¶ 48(c) (1999).

[2] See Order No. 2, *Joint Application of Southwestern Bell Telephone Co. and AccuTel of Texas, Inc. for Approval of Amendment of Interconnection Agreement Under PURA and the Telecommunications Act of 1996*, Docket No. 21803 (Tex. PUC Jan. 12, 2000) (attached hereto as Exhibit A).

[3] See Resale Agreement Between Southwestern Bell Telephone Co. and AccuTel of Texas, Inc. § I.A & Exh. A (attached to *Joint Application of Southwestern Bell Telephone Co. and AccuTel of Texas, Inc. for Approval of an Amendment to the Interconnection Agreement under PURA and the Telecommunications Act of 1996*, Docket No. 21803 (Tex. PUC filed Dec. 8, 1999)) ("AccuTel Resale Agreement") (attached hereto as Exhibit B).

23.76 percent wholesale discount.[4] The non-recurring charge includes the retail, tariffed, one-time charges for processing the new service order ($22.00), for central office line connection ($16.35), and for the trip charge ($14.60).

23. Approximately one year later, AccuTel filed a complaint before the Texas Commission, in which it took issue with a single component of the wholesale price for new connect orders — the service order charge for resale orders submitted electronically, using an interface provided by SWBT. AccuTel did not dispute that, under the agreement, the applicable service order charge was $14.96, which was calculated by taking the $22.00 retail tariffed rate and subtracting the then-applicable 32 percent wholesale discount. Instead, AccuTel sought to alter the terms of the parties' agreement to reduce that charge.

24. Even though the 1996 Act does not require prices to be updated during the term of an existing interconnection agreement, and the Resale Agreement sets the appropriate rate for resale new-connect orders submitted electronically, SWBT nonetheless agreed to negotiate a resolution with AccuTel. Following those negotiations, AccuTel filed a petition for arbitration with the Texas Commission under 47 U.S.C. § 252(b), seeking to "re-negotiate a specific term in its existing resale agreement with SWBT."[5]

25. The parties engaged in discovery and presented evidence both in written form and at a hearing on the merits held November 28, 2001. After briefing by the parties on the merits, the Arbitrators released their arbitration award on January 25, 2002.[6] The Arbitrators agreed

---

[4] [$52.95] - [$52.95 * 0.2376] = $40.37. [$31.95] - [$31.95 * 0.2376] = $24.36.

[5] Petition for Arbitration at 1, *Arbitration for Interconnection Between 1-800-4-A-Phone and Southwestern Bell Telephone Co.*, Docket No. 24547 (Tex. PUC filed Aug. 22, 2001). The parties agreed that AccuTel would dismiss its complaint and resolve the dispute through arbitration.

[6] *See* Arbitration Award, *Arbitration for Interconnection Between 1-800-4-A-Phone and Southwestern Bell Telephone Co.*, Docket No. 24547 (Tex. PUC rel. Jan. 25, 2002) ("Arbitration Award") (attached hereto as Exhibit C).

8

with AccuTel that the appropriate price under federal law for AccuTel's electronically submitted resale new-connect orders is $2.58, which is the TELRIC-based rate that the Texas Commission established for new-connect orders using unbundled network elements. *See* Arbitration Award at 14.

26.    In reaching this conclusion, the Arbitrators reasoned as follows: the act of processing a service order for a new connection for an end-user customer is a function of SWBT's operations support systems ("OSS"); the FCC has found that these systems are, themselves, unbundled network elements to which access must be provided to CLECs at cost-based rates; it makes no difference that SWBT is establishing a new telecommunications service that the CLEC intends to resell to an end-user customer rather than setting up a new combination of separate unbundled network elements with which the CLEC would provide service to an end-user customer, because the service order processing itself is not materially different under either scenario; therefore, SWBT should charge a cost-based, TELRIC rate for the service order processing for a resale new-connect order rather than applying the wholesale discount to the tariffed retail rate for this function. *See id.* at 8, 14-17. In other words, even though AccuTel was only interested in reselling SWBT's services, the Arbitrators required SWBT to charge AccuTel the much lower, TELRIC-based rate for setting up a new-connect order using unbundled network elements. This decision effectively increased the wholesale discount provided to AccuTel in clear violation of the methodology for setting the wholesale discount under the 1996 Act – namely, by taking the retail rate that the incumbent provider actually charges its own retail customers for establishing a new service connection and subtracting the costs (such as advertising, marketing, etc.) that the incumbent avoids by providing the service at wholesale.

9

27. As ordered by the Arbitrators, the parties jointly filed language conforming to the arbitrators' determination on February 18, 2002. SWBT also filed comments objecting to the Arbitration Award. On May 16, 2002, the Texas Commission approved that award[7] and required SWBT and AccuTel to submit an executed copy of a Resale Agreement incorporating the conforming language, for the Texas Commission's approval. On May 21, 2002, SWBT filed a motion for a stay of the Order pending judicial review, and the Texas Commission denied the motion on June 7, 2002.[8]

### The Texas Commission's Determination is Unlawful

28. The Texas Commission's Order, which requires the service order processing charge for electronically submitted resale new-connect orders to be calculated using the TELRIC methodology that applies to unbundled network elements is contrary to the 1996 Act and the FCC's interpretation of the 1996 Act.

29. The 1996 Act draws a clear distinction between providing local service through resale and through unbundled network elements. The FCC has explained this distinction as follows: while "a carrier offering services solely by recombining unbundled network elements can offer services that differ from those offered by an incumbent," *Local Competition Order*, 11 FCC Rcd at 15668, ¶ 333, "carriers reselling incumbent LEC services are *limited to offering the same service* an incumbent offers at retail," *id.* at 15667, ¶ 332 (emphasis added). Therefore, "resellers cannot offer services or products that incumbents do not offer" and their ability to

---

[7] Order Approving Arbitration Award, *Arbitration for Interconnection Between 1-800-4-A-Phone and Southwestern Bell Telephone Co.*, Docket No. 24547 (Tex. PUC rel. May 16, 2002) ("Order") (attached hereto as Exhibit D).

[8] *See* Memorandum from Melissa Silguero, Policy Development Division, Texas PUC, to All Parties of Record, Docket No. 24547 (Tex. PUC rel. June 7, 2002) (attached hereto as Exhibit E).

differentiate themselves from the incumbent "based on price is *limited ... by the margin between the retail and wholesale price of the product.*" *Id.* at 15667-68, ¶ 332 (emphasis added).

30.   Under the Texas Commission's Order, however, the price AccuTel pays for reselling SWBT's local telephone service to a new customer is not calculated by taking the retail rate and subtracting the generally applicable 23.76 percent wholesale discount. Instead, the Texas Commission has effectively increased the wholesale discount on resold new connect orders — in the above example, to 40.48 percent for the first month of service.[9] Yet the additional discount for these orders, and these orders alone, is based not on any costs SWBT has avoided, but instead on the hypothetical, cost-based price – without regard to the actual cost or retail price – of setting up a new connection, as if that new service were being provided through unbundled network elements.

31.   The Texas Commission's decision is based on the fundamentally mistaken premise that operation support systems ordering functions must be priced at TELRIC even when the CLEC is using this function to order a resold service. *See* Arbitration Award at 17. While it is certainly true that the FCC has placed SWBT's operation support systems on its list of unbundled network elements, it does not follow that, when those systems are part of a telecommunications service offered to retail customers, it is appropriate to carve one function performed by those systems out of the complete retail service and to price it as though it alone were being provided as an unbundled network element.

32.   By way of example, the copper wire that connects an end user's premises to the central office – the local loop – is also on the FCC's list of unbundled network elements. A

---

[9] The first month payment from the retail customer in the above example would be $84.90 ($52.95 + $31.95). Under the Order, AccuTel would pay only $50.54 to resell that service for the first month — a $26.18 non-recurring charge and a $24.36 monthly charge — a 40.48 percent discount ([84.90 - 50.54] / 84.90 = 40.48%).

11

CLEC may provide local telephone service to that end user by obtaining access to that loop as an unbundled network element and by combining it with other such elements, such as local switching and transport. In that scenario, the CLEC would pay TELRIC-based rates for access to that loop. In fact, the CLEC would pay the TELRIC rates for each unbundled piece of the network used to provide local service, including switching and local transport. Alternatively, the CLEC could also provide local telephone service to that end user by reselling SWBT's retail service. In that case, the service would likely be provided using the exact same copper loop, switching, and transport that would have been made available to the CLEC if it were purchasing the network elements separately, but the CLEC would *not* pay TELRIC rates for this service. Instead, the CLEC would pay the retail rate for the service, less the avoided-cost discount (here, 23.76 percent). The mere fact that the FCC has found that a part of SWBT's network can be purchased as an unbundled network element does not mean that TELRIC pricing applies to that piece of the network when it is used to provide a resold telecommunications service. Just like the copper loop, the function of setting up the new service is inextricably part of the wholesale telecommunications service and, indeed, is offered to retail customers as such.

33. Moreover, it makes no difference that AccuTel submits its resale new-connect orders *electronically*, whereas new SWBT retail customers must place such orders *manually* by contacting SWBT's customer service center. The wholesale discount that is taken off of the manual, retail service-order charge already takes into account the fact that CLECs will be submitting their resale new-connect orders electronically. In developing the applicable wholesale discount, the Commission determined that 80 percent of the expenses in the revised Uniform System of Accounts Number 6623 (customer services) should be presumed avoided. Account 6623 includes SWBT's expenses in "establishing . . . customer accounts," including "[i]nitiating

12

customer service orders." 47 C.F.R. § 32.6623(a)(1). SWBT could avoid 80 percent of those expenses in providing wholesale services only if CLECs were to submit their orders electronically.

34.  Furthermore, in the course of SWBT's application filed with the FCC for approval to provide long-distance service in Texas, the FCC reviewed SWBT's pricing of resold services and found that it satisfied the requirements of section 252(d)(3).[10] In response to SWBT's application, some commenters challenged SWBT's pricing of certain resold telecommunications services. At the "direct request of [FCC] staff," SWBT explained that, for "new services established by a CLEC using resold SWBT services, SWBT's tariffed service connection charges – the same charges SWBT applies to its retail customers, less the . . . wholesale avoided cost discount – apply."[11] In its order approving SWBT's application, the FCC expressly incorporated SWBT's explanation, stating that "SWBT assesses a 'service connection charge' when a competing carrier establishes a new service using resold SWBT service" and that this charge "is the same charge [SWBT] assesses its retail customers, but resellers receive a . . . discount."[12] The FCC never suggested that SWBT's pricing practices were contrary to the 1996 Act or that SWBT was required to apply the TELRIC-based, unbundled-network-element rate in these circumstances. Instead, the FCC expressly rejected claims that "SWBT's resale-related OSS charges are discriminatory."[13] As a result, the FCC concluded that "SWBT demonstrates that it

---

[10] Memorandum Opinion and Order, *Application by SBC Communications Inc., et al., Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas*, 15 FCC Rcd 18354, 18544-46, ¶¶ 388-391 (2000) ("*Texas 271 Order*").

[11] *Ex parte* Letter from Austin C. Schlick to Magalie Roman Salas, FCC, at 2 & Attach. 2, at 1, *Application by SBC Communications Inc., et al., Pursuant to Section 271 of the Telecommunications Act of 1996 To Provide In-Region, InterLATA Services In Texas*, CC Docket No. 00-4 (FCC filed Mar. 17, 2000).

[12] *Texas 271 Order*, 15 FCC Rcd at 18546, ¶ 391.

[13] *Id.*

13

makes telecommunications services available for resale in accordance with sections 251(c)(4) and 252(d)(3)."[14]

### COUNT ONE

35.     SWBT restates and incorporates by reference each and every allegation in paragraphs 1 through 34 as if the same were fully set forth herein.

36.     While the 1996 Act displaced traditional state regulatory authority of local competition, Congress invited the states to play a role in the implementation of the new federal requirements established by the 1996 Act. In considering and ruling on AccuTel's petition for arbitration, the Texas Commission and the Commissioner Defendants were acting pursuant to this grant of authority to participate in implementing the requirements of the 1996 Act.

37.     The Texas Commission's Order purports to implement the requirements of the 1996 Act. That Order effectively increases the wholesale discount available to AccuTel for its orders to serve a new end-user customer through resale, without following the statutorily mandated avoided cost methodology. Instead, the Order requires SWBT to charge AccuTel the cost-based charge that the Texas Commission established for processing orders to serve a new end-user customer through unbundled network elements. The Order, therefore, is inconsistent with sections 251 and 252 and with the FCC's decisions implementing those sections. The Order is also arbitrary and capricious, results from a failure to engage in reasoned decision-making, and is not supported by the record developed in the Texas Commission proceeding.

---

[14] *Id.* at 18544, ¶ 388.

14

## PRAYER

SWBT respectfully requests that this Court grant it the following relief:

a. enter judgment in favor of SWBT, declaring that the Order and the Resale Agreement that the Order requires to be filed are contrary to the 1996 Act;

b. enter judgment in favor of SWBT, permanently enjoining the Texas Commission, the Commissioner Defendants, AccuTel, and anyone acting in concert with AccuTel from enforcing or attempting to enforce the Texas Commission's Order, or the Resale Agreement that Order requires to be filed;

c. award SWBT its reasonable costs and attorneys fees; and

d. grant such other relief as the Court deems just and proper.

Respectfully submitted,

Javier Aguilar
State Bar No. 00936300
Southern District of Texas Bar No. 3429
Geoffrey Amsel
State Bar No. 01161570
Southern District of Texas Bar No. 22716
Southwestern Bell Telephone, L.P.
1010 N. St. Mary's, Room 1400
San Antonio, Texas 78205

OF COUNSEL:
Geoffrey M. Klineberg
Scott H. Angstreich
Kellogg, Huber, Hansen, Todd
 & Evans, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

Ann Meuleman
General Counsel – Austin
Thomas J. Horn
General Attorney
Southwestern Bell Telephone, L.P.
1616 Guadalupe, Room 600
Austin, Texas 78701
Telephone: (512) 870-5700
Facsimile: (512) 870-3420